[No. B106780. Second Dist., Div. Four. July 25, 1997.]

UNION OF NEEDLETRADES, INDUSTRIAL & TEXTILE
EMPLOYEES, AFL-CIO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TAUBMAN COMPANY et al., Real Parties in Interest.

COUNSEL

Rothner, Segall, Bahan & Greenstone, Della Bahan, Anthony R. Segall, Talcott, Lightfoot, Vandevelde & Sadowsky, Stephen B. Sadowsky, James H. Locklin and David Schwartz for Petitioner.

No appearance for Respondent.

Cook & Roos, John C. Cook, Susan H. Roos, John F. Hyland, W. McLin Lines, W. M. Lines, Katten, Muchin & Zavis, Thomas J. Leanse, Stacey R. Konkoff and Michelle A. Curtis for Real Parties in Interest.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

In *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341] (*Pruneyard*), the California Supreme Court held that state constitutional provisions protect the right to engage in "speech and petitioning, *reasonably exercised,* in shopping centers even when the centers are privately owned."[1] (23 Cal.3d at p. 910, italics added.) The court based its conclusion on the growing role of shopping centers as centers of commerce in our society. However, as the italicized phrase indicates, the right to conduct expressive activities in a shopping center is not absolute. The Supreme Court expressly stated: "By no means do we imply that those who wish to disseminate ideas have free rein." (*Ibid.*) The center can impose time, place, and manner rules (*ibid.)* and can adopt reasonable regulations " 'to assure that [the expressive activities] do not interfere with normal business operations.' " (*Id.* at p. 911.) In a nutshell, the issue raised by this writ proceeding is whether the challenged rules adopted by six malls pass constitutional muster. We find no constitutional deficiencies.

---

[1] Article I, section 2, subdivision (a) of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

Section 3 of article I of the California Constitution further provides: "The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."

## Factual and Procedural Background

*The Dispute*

The Union of Needletrades, Industrial & Textile Employees, AFL-CIO (UNITE) is engaged in a labor dispute with Guess?, Inc. about the wages and working conditions of the individuals who manufacture Guess?, Inc. clothing apparel. Guess?, Inc. operates retail stores in six shopping malls owned by defendants: Beverly Center, Westside Pavilion, Glendale Galleria, Del Amo Fashion Center, Sherman Oaks Fashion Square, and Century City Shopping Center.

UNITE sought access to the six malls to publicize its labor dispute with Guess?, Inc. UNITE wished to place four individuals in front of the Guess?, Inc. store in each mall to picket and distribute leaflets. A sample leaflet supplied by UNITE critiques the working conditions of the laborers who make Guess?, Inc. apparel, attacks the profit made by the owners of Guess?, Inc., and concludes: "That's why we're asking you to help us tell Guess to take direct responsibility to pay the workers who sew the Guess label decent wages and benefits!"[2] The labor dispute does *not* concern the conditions of the employees working at the Guess?, Inc. retail stores in the malls.

Each mall has promulgated rules and regulations to govern the exercise of free speech rights. In regard to all of the malls except for Beverly Center, UNITE failed to submit completed application forms, asserting that the questions and/or requirements imposed were unconstitutional on their face. Consequently, UNITE was denied access to those five malls. In regard to Beverly Center, the management of that mall accepted UNITE's application but refused to permit it to pass out flyers and hold signs directly in front of the Guess?, Inc. store because to do so would violate fire regulations. Beverly Center suggested an alternative location—across from the Guess?, Inc. store—which UNITE found unacceptable.

UNITE then filed suit against the six malls. Its first amended complaint alleged that defendants had adopted and enforced "unreasonable and burdensome rules and requirements regulating political expression." UNITE alleged: "The rules, regulations and applications required by defendants are unreasonable, arbitrary and unconstitutional conditions on the right to engage in free speech at the defendants' shopping centers in that they substantially burden and interfere with plaintiffs' ability to peacefully communicate

---

[2] In a subsequent hearing, counsel for UNITE conceded that the group intends to discourage customers from purchasing goods.

with shoppers, to solicit their support, and to encourage shoppers to associate with them and assist them in their expressive activities. These rules, regulations and application procedures interfere with the right of the shoppers at defendants' shopping centers to receive information and communicate and associate with other groups and individuals. These rules are overbroad and unnecessary to further or protect defendants' interest in preventing interference with normal business operations."

Insofar as is pertinent to this proceeding, UNITE sought a preliminary injunction restraining defendants from enforcing the challenged rules and regulations. We now set forth the particulars of those rules and regulations as well as the evidence the various shopping centers produced in the trial court to explain the purpose and implementation of the rules, evidence which UNITE failed to contradict in any manner.

*The Challenged Rules*

### 1. *Designation of Area*

The first rule limits the area in which individuals may engage in expressive activity. Beverly Center's rule states: "Petitioning shall only take place in the designated area specified in the permit. Problems of littering justify limiting Applicants who intend to distribute literature to the approved locations. In addition, normal business conditions, including the maximum amount of petitioning traffic which can reasonably be accommodated in one location at one time on a normal business day during both peak and non-peak business hours and the presence of special events, such as sales or special commercial displays, based on the size and nature of the special events will affect whether a particular area may be designated for petitioning. The Center reserves the right to change the designated area in good faith as the Center deems necessary for commercial operation of the Center."

In the trial court, Beverly Center produced evidence to establish the following. It has designated areas on the sixth and eighth floors for expressive activity. Fire regulations would be violated were UNITE to conduct its activity in front of the Guess?, Inc. store. To accommodate UNITE's desire to reach potential customers of Guess?, Inc., Beverly Center designated a temporary area for UNITE on the seventh floor near the escalators and thirty-two and one-half feet across from the Guess?, Inc. store. The fire department refused to issue a permanent permit for that location.

Glendale Galleria's rule states: "The Activity shall be conducted only in the Designated Area selected by the Applicant from those Designated Areas

set forth on Exhibit A [to these rules] and available for use. No Activity shall be allowed at any other location, including driveways and parking lots." The Exhibit A referenced in the rule designates five areas for expressive activity. In the trial court, Glendale Galleria submitted the declaration of its General Manager Cynthia Chong (Chong) to explain its policy of limiting expressive activity to designated areas. She averred that absent that policy, mall patrons would not be able to avoid contact with individuals whose causes do not interest them. If patrons are annoyed by "an individual who wants them to sign a petition and will not take no for an answer," those patrons may simply take their business elsewhere, thereby economically harming the Glendale Galleria. Chong also explained that if an individual "roams the Mall," the Glendale Galleria cannot effectively disavow support of that particular cause.

Westside Pavilion's rule provides: " 'Approved Area' is that area selected by the Applicant from the Designated Areas identified on the Center's lease plan (Exhibit A), available for selection for use on the particular date(s) desired by the Applicant. Each Designated Area is approximately 120 square feet in size." In the trial court, Westside Pavilion presented evidence to establish the following. It has designated two areas for expressive activity. It selected the areas based upon safety concerns and consideration of ingress and egress to the center and its stores. To permit UNITE to conduct its activities directly in front of the Guess?, Inc. store "would block the flow of traffic through the area and create congestion in the main exit corridor."

Century City Shopping Center, Del Amo Fashion Center, and Sherman Oaks Fashion Square each employ an identical rule. The rule provides: "[The shopping center] will regulate the time, place, and number of participants engaging in an expressive activity on the common areas of the shopping center to assure that there is no interference with normal business operations, customer convenience, the use of the shopping center as a center of commerce, or any or all of the individual businesses in the shopping center." The rules then set forth eight criteria the center will apply to determine the time and place of the expressive activity and the number of participants.

Additionally, in the trial court, Del Amo Fashion Center submitted evidence that it has four areas designated for expressive activity. The locations were selected to comply with fire regulations, "to give maximum exposure to individuals engaging in expressive activity, to guarantee the free flow of customer traffic and to maintain the visibility of tenant storefronts." The area directly in front of the Guess?, Inc. store is in a main corridor which the fire department had prohibited from being used for expressive activity.

### 2. *Limitation on Days*

Each center limits the number of consecutive days a particular organization can engage in expressive activity and further requires advance notice from an organization before it will allow the activity to proceed.

Beverly Center limits an applicant to three consecutive days and requires advance notice of five business days. Glendale Galleria limits an applicant to three consecutive days and requires advance notice of four business days. Westside Pavilion requires advance notice of four business days and limits an applicant to three consecutive days with the possibility of an additional two consecutive days if the designated area is not being used by others. Westside Pavilion also reserves the right to limit a particular applicant to 14 days per year. Century City Shopping Center, Del Amo Fashion Center, and Sherman Oaks Fashion Square each employ an identical rule permitting use for three consecutive days including a weekend or five consecutive weekdays and requiring advance notice of five business days.

The centers adopted rules limiting each applicant's use to avoid the situation in which a particular applicant monopolizes use of the facilities to the exclusion of others. Requiring that an applicant designate in advance the day(s) it desires allows the center to plan for additional cleaning crews, security, and coordination with other groups present that day. Except for Westside Pavilion, none of the centers has a cap on how many days a year an applicant can use the centers. If an applicant wishes to return shortly after it has used its time, the applicant is not required to resubmit the whole application again. A brief request will suffice. The request will be honored unless other groups have already reserved the time.

Additionally, some of the centers have "blackout periods" in which no expressive activity is permitted.

Beverly Center's rules provide: "Center management may designate up to twenty-five (25) days during each calendar year as 'peak traffic days' when, due to anticipated crush of patrons, and/or marketing related promotional events or activities, non-commercial expressive activities would unduly impair pedestrian traffic in the Center and is, therefore, prohibited." Based upon this rule, Beverly Center barred activity in 1996 on November 16, 17, 22-24, 27-30, and December 1, 14-24, and 26-29.

Glendale Galleria designates 30 days as "peak traffic days" during which "all Non-Commercial Expressive Activity is prohibited."

Westside Pavilion designates "the period from the weekend before Thanksgiving to, and including, January 2 of the following year [as] 'peak traffic days' when non-commercial expressive Activity is prohibited."

Del Amo Fashion Center's rules provide that in designating the time of the permitted expressive activity, it will consider, inter alia, the "season of the year." A declaration from its counsel, who has been responsible for administering the public access rules since 1984, explained that expressive activity is not allowed during the holiday season between Thanksgiving and New Year's Day.

### 3. *Prior Approval of Signs and Literature*

Each center has rules requiring prior submission of signs and literature.

Beverly Center's rule provides that any sign, poster, or place card "shall be two dimensional, neat in appearance, and compatible with the general aesthetics of the mall, shall not interfere with or directly compete with business displays or logos, and shall not contain obscene, pornographic, patently vulgar, gruesome or grisly material or displays, or highly inflammatory slogans likely to provoke a disturbance."

Glendale Galleria's rules state: "No sign, poster, placard, display or written material shall interfere with the commercial purpose of the Center or its tenants, or contain or depict 'fighting words,' obscenities, pornography, grisly or gruesome displays, highly inflammatory slogans likely to provoke a disturbance, or racial, religious or ethnic slurs."

Westside Pavilion requires prior submission of written material to ensure "that no aspect of the expressive activity will disrupt normal business operations, will interfere with customer convenience, or is otherwise improper." Prohibited contents include fighting words, obscenities, pornography, grisly or gruesome displays, "highly inflammatory slogans likely to provoke a disturbance, or racial, religious or ethnic slurs."

The rules promulgated by Century City Shopping Center, Del Amo Fashion Center, and Sherman Oaks Fashion Square are identical and essentially track those of the centers in terms of purpose (avoid disruption) and prohibited content (fighting words, obscenities, highly inflammatory slogans, etc.).

### 4. *Prior Identification of Participants*

Each center has enacted a rule requiring the applicant to disclose in advance the identities of its participants in the planned expressive activity.

Beverly Center, Glendale Galleria, and Westside Pavilion require the applicant to list all persons who will engage in the expressive activity.

Additionally, when the participant arrives at the center he or she must provide identification, acknowledge having read the mall's rules, and agree to abide by those rules.

Century City Shopping Center, Del Amo Fashion Center, and Sherman Oaks Fashion Square impose an additional requirement. The applicant must disclose: "Any previous injury(ies) to persons or property while such person was engaged in a similar expressive activity [and] [t]he other locations, whether publicly or privately owned, at which such person engaged in a similar expressive activity within the last 12 months . . . ."

### 5. Insurance Requirement

The management of each center has the discretion to require the applicant to purchase insurance. The Beverly Center rule is typical of that promulgated by each center. The rule provides: "If the nature or timing of the activity creates a foreseeable risk of injury or damage to persons or property, and that risk, in the discretion of management, warrants special insurance protection, Applicant must purchase and carry the necessary insurance coverage as determined by [the] Center management." The application form asks for the name of the insurance company but then states: "Failure to be covered by such insurance will not be cause for denial of this permit application, unless foreseeable risk warrants the need for special insurance (see guidelines, pg. 3, number 9)."

The insurance requirement is not always enforced. For instance, a declaration from the assistant general manager of Beverly Center averred: "Although there is a requirement for insurance, that is discretionary depending on the activity proposed and is often waived." A declaration from the general manager of Beverly Center averred: "The insurance information requested in the Application is necessary in the event there is a problem. If the applicant has insurance they provide the requested information. If they do not have insurance, they leave it blank. . . . [¶] Our Guidelines provide that if the activity creates a 'foreseeable risk of injury or damage' we may ask for special insurance. (Part Three, ¶ 9). We base our determination on several factors, such as our prior experience with the particular individual or group, and that of other shopping centers and malls. We also base it on our experience, and the experience of other malls and shopping centers when this type of expressive activity is conducted. Finally, we look to see whether we can reduce the risk by assigning extra security personnel. [¶] . . . *I have never requested special insurance from any petitioner and have not, nor would I, request that UNITE provide it.*" (Italics added.)

The applications for Del Amo Fashion Center and Century City Shopping Center each state: "Even if the Applicant is not required to secure general liability insurance coverage before a permit is issued, the Applicant must provide the following information about any *existing* general liability insurance policy covering the Applicant while engaged in the planned expressive activity." (Italics in original.) A footnote to that statement reads: "Unless the Applicant, or the Participant, is engaging in the proposed expressive activity for profit, the Applicant's or Participant's homeowner's, or renter's, insurance package may include general liability insurance covering the Applicant or Participant while engaged in the proposed expressive activity." Counsel for Del Amo Fashion Center averred: "Having applicants provide information about existing general liability insurance allows me to verify whether prior injuries to persons or damage to property have occurred in the course of similar activity and whether applicants have the coverage they claim."

A declaration from the property manager for the Westside Pavilion explained that the rule allowing it to require insurance "is needed for the protection of Westside Pavilion from risks inherent in some expressive activities. *In the case of UNITE's currently proposed activity, insurance would not be required.*" (Italics added.)

### 6. *Cleaning/Damage Deposit*

In lieu of the insurance requirement, two of the centers—Glendale Galleria and Westside Pavilion—can require an applicant to post a damage deposit if the center determines the proposed activity "poses a risk of damage to property."

### 7. *Prohibition Against Interference With Mall Tenants*

Each mall has a rule prohibiting, to one extent or another, interference with a tenant. These rules are the only ones about which the trial court had concerns. While the trial court indicated the rules were potentially constitutionally infirm because the rules created the potential for impermissible content-based regulation, it nonetheless declined to reach the issue on the merits because UNITE refused to submit completed applications. While we share the trial court's concern, we do not, as will be explained later, reach the issue of the ultimate validity of the rules given the manner in which the issue has been litigated.

Beverly Center's rules prohibit: "Acts of interference, directly or indirectly, with the commercial operation of the Center [and] its patrons."

Glendale Galleria prohibits "[a]ctivities which identify by name . . . any tenant in the Center."

Westside Pavilion prohibits any signs or leaflets which "interfere with the commercial purpose of the Center or its tenants" and bars a participant from any effort to "[i]mpede, obstruct or interfere with any . . . tenant of the Center . . . ."

Century City Shopping Center, Del Amo Fashion Center, and Sherman Oaks Fashion Square have rules prohibiting any "[i]nterfering with the business of any of the stores by: . . . [u]rging, or encouraging in any manner, customers not to purchase the goods or services offered by the store."

*UNITE's Applications*

Because UNITE contended that the above rules and requirements are not constitutional, it refused to give responsive answers to the questions on the centers' applications which were derivative of those rules and requirements. When asked to designate the date and hours requested for its activities, UNITE answered: "[c]ontinuing during pendency of labor dispute [for] [a]ll hours Guess store is open for business." UNITE indicated its intent to conduct its actions in front of the Guess?, Inc. store and its refusal to do so in any other area designated by the centers. When asked whether it possessed liability insurance, UNITE responded: "Decline to state." When asked to provide in advance a list of participants, UNITE responded: "Applicant will provide a list of participants on each day of activity." When asked to designate the other locations it had engaged in similar expressive activity, it responded: "Numerous locations throughout U.S."

*The Hearing on UNITE's Request for a Preliminary Injunction*

A lengthy hearing was held on UNITE's request for a preliminary injunction. The trial court found that all of the questions on the applications as well as the requirements imposed by the centers were constitutional with one exception: the rules prohibiting interference with a tenant's business. In regard to those latter rules, the trial court declined to decide whether those rules could give rise to impermissible content-based regulation. After the court expressed its tentative ruling, UNITE reiterated its position that it would not submit complete applications. The court denied UNITE's request for a preliminary injunction. Its minute order states: "The Court finds that plaintiff [UNITE] has not established the probability of prevailing on the merits of their claim at trial."

UNITE then filed the instant petition for a writ of mandate in this court. We issued an order to show cause.

## DISCUSSION

Before we analyze the particular rules challenged by UNITE, we address two preliminary but important matters.

The first matter is UNITE's claim that it is mounting only a *facial challenge* to the rules as opposed to a challenge as to the manner in which the rules are *applied to it*. This claim is not completely accurate. While it is true that UNITE's first amended complaint is couched in the language of a facial challenge and that its reply to the returns to its writ petition urge that it is making only a facial challenge, UNITE is, to some extent, claiming that when certain of the rules are applied to it, its constitutional rights are impermissibly limited. For instance, UNITE's argument that the centers cannot limit UNITE to designated areas but that UNITE has a right to act directly in front of a Guess?, Inc. store is essentially an argument that when the designated speech area rule is applied to UNITE, UNITE is singularly and unreasonably injured. This is not a facial challenge because a group wishing to disseminate information about an issue unrelated to anything in the center (e.g., the Middle East) could not claim that being in a designated area as opposed to the front of a particular store infringed its rights. Consequently, when the rules which particularly impact UNITE are analyzed, our analysis will not be limited to examining the rule on its face; we will also address the particular facts.

The second matter to be addressed at this juncture is the appropriate standard of review. UNITE's writ petition challenges the trial court's denial of its request for a preliminary injunction to prohibit the centers from enforcing the challenged rules. ■ "The granting or denying of a preliminary injunction does not constitute an adjudication of the ultimate rights in controversy. [Citations.] Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. [Citations.]" (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) A trial court will be found to have abused its discretion only when it has " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].) As the party challenging the injunction, it is UNITE's burden to make a clear showing of an abuse of discretion. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].)

### 1. *Designation of Area*

■ In promulgating time, place, and manner rules governing when, where, and how a group may exercise expressive rights, a shopping center is

constitutionally permitted to protect "important rights of substance; those rights are identified as freedom from disruption of normal business operations and freedom from interference with customer convenience." (*H-CHH Associates* v. *Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1208 [238 Cal.Rptr. 841] (*H-CHH*).) This is because a shopping center exists as a center of commerce. "[I]ts function is to facilitate the ease of commerce and to promote the business of its merchant tenants." (*Id.* at p. 1221.) Consequently, a center can impose reasonable and objective limitations on the number of persons who can be present and those persons can be required to be in an area so as to limit disruption. They can be prohibited from areas normally subject to congestion and " 'can be excluded entirely from areas where their presence would threaten personal danger or block the flow of . . . traffic, such as doorways and loading areas. [Citation.]' " (*Id.* at p. 1208.)

■ In light of these principles, it is clear that contrary to UNITE's argument, a shopping center is constitutionally empowered to enact a rule limiting expressive activities to a particular area.

In the trial court, Beverly Center presented evidence that it designated two speech areas to avoid unwarranted interference with its tenants' commercial operations and violations of the building code and fire and safety code. These are legitimate interests to be protected. Additionally, Beverly Center offered evidence that permitting UNITE to act directly in front of the Guess?, Inc. store would violate the fire and safety code. UNITE failed to offer any evidence to contradict any of Beverly Center's showings. It therefore follows that the trial court did not abuse its discretion in denying UNITE's request to enjoin enforcement of Beverly Center's designated area rules.[3]

UNITE argues that this conclusion denies it the right to its most effective point of persuasion: immediately in front of the Guess?, Inc. store.[4] Putting aside the fact that there is absolutely no evidence to support this claim given

---

[3]At the hearing on motion for a preliminary injunction, the court stated: "I'm satisfied from the evidence that I have before me that there are fire department regulations that strongly mitigate [*sic*], to say the least, against permitting your client to demonstrate or express its First Amendment rights in front of the Guess location at the Beverly Center. . . . I can't imagine my issuing an injunctive order requiring the Beverly Center to permit your clients to engage in expressive activity in an area that the fire department prohibits."

[4]UNITE's reliance upon *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921] (*Schwartz*) for the proposition that as a matter of law it is entitled to be in front of the Guess?, Inc. store is misplaced. *Schwartz*, decided 15 years prior to *Pruneyard, supra,* 23 Cal.3d 899, involved a dispute between a large shopping center and a union which was attempting to organize the

UNITE's failure to even avail itself of the opportunity offered by Beverly Center to act directly across from the store,[5] precedent shows the argument to be meritless. In *Savage* v. *Trammell Crow Co., supra*, 223 Cal.App.3d 1562, a shopping center prohibited distributing leaflets in a parking lot but permitted leafletting on the center's sidewalks. An individual challenged the

employees of a bakery located inside of the center. The issue was whether the union could engage in picketing directly in front of the bakery. The shopping center wished to limit the union to the nearby public streets or sidewalks. The court concluded: "[T]he picketing in the present case cannot be adjudged in the terms of absolute property rights; *it must be considered as a part of the law of labor relations,* and a balance cast between the opposing interests of the union and the lessor of the shopping center. The prohibition of the picketing would in substance deprive the union of the opportunity to conduct its picketing at the most effective point of persuasion: the place of the involved business. The interest of the union thus rests upon the solid substance of public policy and constitutional right; the interest of the [lessor] lies in the shadow cast by a property right worn thin by public usage." (61 Cal.2d at pp. 774-775, italics added.)

*Schwartz* is clearly distinguishable from this matter. For one thing, it involved the attempt of the union to organize the onsite employees of a business located in the center; this matter involves the union's attempt to publicize the *conditions of offsite* workers and to urge consumers to boycott the products sold in one of the center's stores manufactured by those offsite workers. Along that line, federal law now provides that nonemployee organizers do not have a right to engage in labor picketing on a privately owned shopping center if the onsite employees are otherwise accessible. (*Lechmere, Inc.* v. *NLRB* (1992) 502 U.S. 527 [112 S.Ct. 841, 117 L.Ed.2d 79].)

Furthermore, *Schwartz* is of dubious value for the proposition cited given that it predates *Pruneyard* by 15 years and *Pruneyard* is the linchpin of the claim that there is a state constitutional right—the United States Supreme Court having rejected in *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [92 S.Ct. 2219, 33 L.Ed.2d 131] the contention that there was a federal constitutional right—to engage in expressive activities on large privately owned shopping centers. *Pruneyard*'s discovery of a constitutional right to access and its concomitant holding that a center is allowed to enact reasonable time, place, and manner rules in order to ensure that a center continues to function as a center of commerce must be the starting point of any contemporary analysis. This has been the approach of all subsequent decisions, none of which has relied upon *Schwartz.* (*H-CHH, supra*, 193 Cal.App.3d at pp. 1206-1209; *Savage* v. *Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1571-1573 [273 Cal.Rptr. 302]; *Westside Sane/Freeze* v. *Ernest W. Hahn, Inc.* (1990) 224 Cal.App. 3d 546, 552-556 [274 Cal.Rptr. 51]; *Allred* v. *Shawley* (1991) 232 Cal.App.3d 1489, 1497-1498 [284 Cal.Rptr. 140]; and *Bank of Stockton* v. *Church of Soldiers* (1996) 44 Cal.App.4th 1623, 1628-1629 [42 Cal.Rptr.2d 429].) Contrary to UNITE's argument, the fact that *Pruneyard* cited *Schwartz* several times does not change this conclusion. Those citations were simply for the proposition that the property rights of the shopping centers were not absolute but were subject to a balancing process in determining the right to access. (*Pruneyard, supra*, 23 Cal.3d at pp. 909 & 910.)

In sum, *Schwartz* does not support UNITE's claim that it has a per se right to be directly in front of a Guess?, Inc. store because that is the most effective point of persuasion.

[5]The location of the expressive activity is the only bone of contention between UNITE and Beverly Center. Beverly Center did not require UNITE to purchase insurance or to furnish prior identification of the individuals who would participate. Beverly Center informed UNITE that it could conduct its action from October 12 through 14 and thereafter if space were available.

parking lot ban. The center established that the ban had been enacted to avoid littering and traffic problems. The appellate court found these to be legitimate interests. (*Id.* at p. 1574.) In language equally applicable to UNITE's present claim, the court concluded: "While we do not doubt access to the parking lot would allow greater and easier distribution of leaflets, the adequacy of alternative channels is not measured by the fondest hopes of those who wish to disseminate ideas. [Citations.] Rather, where, as here, an advocate is given a realistic opportunity to reach his intended audience, the alternative channels of communication are adequate. [Citations.]" (*Id.* at pp. 1575-1576.)

Given this analysis, it is clear that UNITE takes out of context the following language from *H-CHH*, *supra*, 193 Cal.App.3d at page 1213: "A regulating authority may not adopt rules which preclude the exercise of free expression *in an appropriate place*, even on the ground another place is available." (Italics added.) In that case, the mall had a written rule stating a petitioner could only use the area(s) designated by the mall and an *unwritten* rule generally placing such activity in one area (Garfield Court). (*Id.* at p. 1212.) The appellate court made the statement quoted above after commenting that these rules were unreasonably restrictive because the mall had failed to show that no location other than Garfield Court could accommodate expressive activity. Here, however, Beverly Center did show why no other areas could accommodate expressive activity. Or stated another way, Beverly Center established that the area in front of the Guess?, Inc. store was not *an appropriate place* at which to conduct expressive activities.

In a similar vein, the trial court did not abuse its discretion in denying UNITE's request to enjoin enforcement of the designated area rule enacted by Del Amo Fashion Center. The uncontradicted evidence established there would be a safety violation were UNITE permitted to act in front of the Guess?, Inc. store in that mall.

The rules enacted by Glendale Galleria and Westside Pavilion pass muster. Each shopping center offered uncontradicted evidence explaining the need for such rules based upon legitimate concerns such as public safety, traffic congestion, and free flow of commerce in the mall.

The identical rules enacted by Century City Shopping Center and Sherman Oaks Fashion Square are likewise valid on their face. Those rules include multiple criteria to be considered in determining the time, place, and manner of the activity. The criteria include those approved in *H-CHH*, *supra*, 193 Cal.App.3d at pages 1212 and 1213. The criteria include the effect of the

expressive activity on business, the amount of space available on a particular day, the manner in which the activity will be presented, and whether literature will be distributed. Clearly, these rules on their face pass constitutional muster. Recognizing that conclusion, UNITE urges "the criteria . . . cannot be applied in a vacuum [but instead] must be applied on a case-by-case basis which takes into account the applicants' need to express themselves at a particular location within the shopping center." Thus, UNITE falls back to the argument that as applied to it, these rules are impermissible because they deny it the right to act directly in front of the Guess?, Inc. store. The argument fails for several reasons. For one thing, because UNITE never submitted a completed application to these centers, none of the centers designated an area for UNITE to act. That is, at this point it is not known whether UNITE would be prohibited from acting in front of the Guess?, Inc. store. For another thing, other than UNITE's ipse dixit, there is no evidence to substantiate its claim that if it is not allowed to act directly in front of or in close proximity to the Guess?, Inc. store in any of these malls, its ability to express itself would be substantially impaired. Furthermore, as stated above and recognized by case law, the petitioner's preferred place of expression is not constitutionally compelled. And lastly, UNITE's argument smacks of content-based regulation in that it is suggesting that the shopping center should consider the content of the individual message in deciding where it should be conveyed. One must wonder whether UNITE seriously wishes to confer that type of discretion upon the management of a shopping center.

## 2. *Limitation on Days*

■ Each center has a rule limiting the number of days a particular group can engage in expressive activities. This is clearly a legitimate effort to ensure that one group does not monopolize the area to the exclusion of others. The rule is content neutral; the number of days available has nothing to do with the content of the group's message. The rule is drawn to further the center's interest of giving equal access to the many organizations which seek entry to its premises. In evaluating whether this rule is narrowly drawn, a reviewing court must give some deference to the means chosen by the responsible decision makers. (*Savage* v. *Trammell Crow Co., supra,* 223 Cal.App.3d 1562, 1574.) "Thus, a regulation must be judged by considering all the groups who would have access to a particular forum and the regulation is valid so long as the property owner could reasonably have determined that its interests overall would be served less effectively without the regulation. [Citation.]" (*Id.* at p. 1575.) Considered in light of these principles, the rules placing time limits on each group's access are proper.

Equally appropriate are the "blackout periods" enacted at some of the centers. In *H-CHH, supra,* 193 Cal.App.3d 1193, the mall prohibited all activity during the Christmas holiday period. The mall offered evidence that during that period there was a demonstrable increase in pedestrian and vehicular traffic as well as additional features in the mall not present during the rest of the year (e.g., large Christmas tree, gift wrapping booth, collection facility for toys, story book displays, etc.). In light of that record, the court upheld the seasonal ban because the mall "had the right and responsibility to keep the courtyard area open and available for movement." (193 Cal.App.3d at p. 1220.)

In this proceeding, each of the malls which has a holiday blackout period—Beverly Center, Glendale Galleria, Westside Pavilion, and Del Amo Fashion Center—offered evidence to explain and justify that temporary ban. UNITE failed to contradict any of that evidence. It is therefore patent the trial court did not abuse its discretion in declining to enjoin enforcement of those bans.

3. *Prior Approval of and Limitation on Signs and Literature*

■ A mall may limit the size and content of posters if based upon objective criteria. In *H-CHH, supra,* 193 Cal.App.3d 1193, the mall had no definite and objective guidelines but left the matter completely within management's discretion. The appellate court found this to be constitutionally deficient. It suggested the mall establish definite sizes and quantities which could be approved and that "[the mall] could regulate style, as opposed to content, requiring that it be compatible with the general aesthetics of the mall, i.e., neat in appearance. The use of 'fighting words,' obscenities, grisly or gruesome displays or highly inflammatory slogans likely to provoke a disturbance, of course, could be prohibited. Examples of the latter would be pictures of aborted fetuses, gross racial caricatures or slogans such as 'kill the pigs now.'" (*Id.* at p. 1216.)

All of the rules enacted by the six centers contain objective guidelines and to the extent content is regulated, do so on the basis set forth above, a point UNITE does not really contest. Furthermore, although not noted by UNITE, *H-CHH, supra,* 193 Cal.App.3d 1193, expressly endorsed the concept of limiting the number and size of signs as long as the limitations were set forth in advance. The only issue not directly discussed in that case is whether a mall can require prior submission of those materials. We see no constitutional impediment to that requirement. Implicit in the right of the mall to regulate the content and style of the signs is the ability to review the signs

and reject those which do not meet its objective standards. Whether the mall reviews the signs on the day the expressive activity is scheduled to take place versus some time prior thereto is of no real consequence to the applicant. In fact, the prior approval process inures to the benefit of the applicant.[6] If, for instance, the signs contain purportedly objectionable language or are the wrong size, the applicant will have time to make or obtain other signs prior to the day of the activity or to judicially challenge the disapproval. If, on the other hand, the applicant does not learn until the date of the activity that there is a problem with the signs, it could very well be too late to obtain anything else for that day's activity. Furthermore, addressing the issue beforehand also allows for time for counsel for the applicant to speak with management in the event of a misunderstanding or misinterpretation. Additionally, the centers have valid interests which are furthered by prior review. For one thing, the centers avoid the problem of having a confrontation with the applicant's members in the event the centers were to attempt to remove the signs. Additionally, the centers avoid the potential situation of an applicant using an inappropriate sign (e.g., "fighting words") and thereby provoking a confrontation with customers offended by the sign. In sum, requiring an applicant to submit signs and leaflets prior to the date of the expressive activity is constitutionally permissible.[7]

---

[6]At oral argument, UNITE urged that the requirement of prior submission of leaflets would preclude it from including unspecified "late-breaking" information in its leaflets. This is another example of UNITE arguing that as applied to it, a particular rule is infirm. While UNITE's argument has a certain logic to it, no evidence was presented in the trial court that this situation has ever arisen and, if so, that any of the centers relied upon the rule requiring prior submission to prohibit dissemination of a leaflet with "late-breaking" news. Given that we are only reviewing the trial court's decision to deny a *preliminary* injunction, it is best to leave this issue to be resolved in the context of the yet-to-be-conducted trial on UNITE's request for a *permanent* injunction. In that context, evidence on this point can be presented and the centers can formulate their response(s).

[7]UNITE's reliance upon *Rosen* v. *Port of Portland* (9th Cir. 1981) 641 F.2d 1243 (*Rosen*) to reach a contrary conclusion is misplaced. Putting aside the fact that decisions of the federal circuit court are not binding upon this court (*Yee* v. *City of Escondido* (1990) 224 Cal.App.3d 1349, 1351 [274 Cal.Rptr. 551], and authorities cited therein), *Rosen* is factually and legally inapposite. It involved a challenge to an ordinance requiring advance registration by those seeking to exercise First Amendment rights at a *publicly owned airport*. In a split decision, the court found the requirement drastically burdened free speech and that the government failed to establish sufficient justification for it. This case, on the other hand, involves a privately owned center which has a substantial interest in ensuring that its as well as its tenants' normal business operations are not interrupted. As we explain in more detail, *post* at pages 1019-1020, that distinction is of manifest significance. At this point, it is sufficient to note that protection of that interest gives rise to the power to engage in limited content regulation of expressive activities (*H-CHH, supra,* 193 Cal.App.3d at p. 1216), a power the government *cannot* claim.

### 4. *Insurance Requirement and Prior Identification of Participants*

■ We examine these two requirements together because, as we will explain, they complement each other.

Each center's rules grant the management discretion to require the applicant to purchase insurance if its proposed action creates a foreseeable risk of harm to person or property. The *H-CHH* court found a similarly worded rule defective because it constituted only a general and subjective standard. (193 Cal.App.3d at pp. 1218-1219.) However, the court held such a provision could pass constitutional muster if the center crafted "necessary objective criteria." The court gave the following examples of such criteria: "(1) Whether there is a prior history of injury to persons or property when this group engages in expressive activity; (2) whether there is a prior history of injury to persons or property when similar groups engage in expressive activity; (3) the historical scope of the risk and whether it exceeds the minimal or inconsequential; (4) whether the risk can be lessened or eliminated by adjusting the time, date, place or planned manner of expression; and (5) if so, whether the applicant is willing to make such adjustments." (*Id.* at p. 1219.) By stating this criteria, the *H-CHH* court implicitly held that in the proper circumstances, a center *can* require an applicant to carry insurance. What is needed is objective criteria by which such a decision is made.

UNITE has suggested that *H-CHH*'s holding that a center can constitutionally require an applicant to carry insurance is no longer viable in light of the United States Supreme Court's decision in *Forsyth County* v. *Nationalist Movement* (1992) 505 U.S. 123 [112 S.Ct. 2395, 120 L.Ed.2d 101] (*Forsyth*). We disagree. In *Forsyth,* a county ordinance imposed a fee for a parade permit, the amount of which was set by the county administrator, subject to a $1,000 cap. The county administrator was allowed to adjust the amount " 'to meet the expense incident to the administration of the Ordinance and to the maintenance of the public order.' " (505 U.S. at p. 131, fn. 9 [112 S.Ct. at p. 2402, 120 L.Ed.2d at p. 112].) The court found the ordinance to be constitutionally deficient. It reasoned: "The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors." (505 U.S. at p. 133 [112 S.Ct. at p. 2403, 120 L.Ed.2d at p. 113].)

In contrast, the *H-CHH* opinion as well as the rules promulgated by the centers *do* provide an objective criteria by which a center can decide to

request insurance from an applicant, a fact that was acknowledged in a post-*Forsyth* case in which the Court of Appeal evaluated a city's requirement that insurance be obtained before a parade permit would be issued. (*Long Beach Lesbian & Gay Pride, Inc.* v. *City of Long Beach* (1993) 14 Cal.App.4th 312, 339 [17 Cal.Rptr.2d 861] (*Long Beach*).)

Furthermore, both *Forsyth* and *Long Beach* point up several factors which distinguish a center's requirement for insurance from a similar requirement imposed by the government. For instance, the *Long Beach* court noted that one of the city's stated reasons for requiring insurance—to protect against claims of liability made against the city by third parties—did not hold up given that the city "would face extremely limited exposure in any event, because of California Tort Claims Act limitations and immunities [citations]." (*Long Beach, supra,* 14 Cal.App.4th at p. 340.) Here, on the other hand, the centers do not enjoy statutory immunity and could be sued by center customers or employees injured in a melee triggered by the applicant and by center retailers whose property is damaged or destroyed in such a melee. Furthermore, while the government has the obligation to defend an unpopular speaker from a hostile mob (*Forsyth, supra,* 505 U.S. at pp. 136-137 [112 S.Ct. at pp. 2404-2405, 120 L.Ed.2d at p. 114]), it is not so clear to us that an equivalent obligation devolves upon a shopping center. Certainly, a shopping center does not have the resources the government possesses in the form of the police to protect an unpopular speaker. Furthermore, the government's obligation to protect the unpopular speaker exists in the quintessential public forums of streets, sidewalks, and parks. Here, on the other hand, we are faced with a situation in which *private property* has been converted into the functional equivalent of a public forum by a holding of the state Supreme Court. While *Pruneyard* held that the California Constitution created a right to engage in expressive activities at *large* shopping centers and malls,[8] the decision certainly could not mean that a shopping center's obligations vis-à-vis expressive activities completely mirror those of the government. Such a conclusion would fly in the face of the reality that a shopping center wears two hats: *one is as a center of commerce and the other is as a public forum located on private property.* All of the appellate decisions beginning with *Pruneyard* have recognized that a center may impose reasonable restrictions in order to allow it to fulfill its original —and certainly primary—function as a place of commerce. In light of that analysis, we believe that UNITE errs when it attempts to literally engraft

---

[8]*Pruneyard* expressly noted: " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment.' " (*Pruneyard, supra,* 23 Cal.3d at p. 910.) In *Bank of Stockton* v. *Church of Soldiers, supra,* 44 Cal.App.4th 1623, 1629-1630, the Court of Appeal reviewed decisions which had applied *Pruneyard* to different types of establishments.

traditional First Amendment jurisprudence addressing the government's efforts to regulate speech and expression onto a case such as this which involves a shopping center's obligation to honor the right to access its property while still existing as a center of commerce. After all, unless this distinction is made, a center's ability to engage in content-based regulation of signs and leaflets to bar fighting words, obscenities, inflammatory words, and gruesome pictures, etc., could not be sustained; the government certainly could neither ask for prior submission of such materials nor designate in advance contents which are "off-limits." A center can do that because, wearing its hat as a center of commerce, it has the right (if not the obligation) to take steps to avoid a breach of the peace which is substantially likely to flow from the use of the prohibited material.

In any event, as explained above, nothing in *Forsyth* detracts from *H-CCH*'s holding a center can impose the requirement of insurance if its decision is based upon objective criteria. In this case, the centers attempt to learn the information needed to make an objective decision about requiring insurance by asking the applicant to identify in advance the individuals who will participate in the action. Additionally, three of the centers want to know the other locations where the participants engaged in similar activity in the prior year and any injuries to person or property which occurred during that activity, the very "objective criteria" the *H-CHH* court said should be used in determining whether to require insurance.

In *H-CHH, supra,* 193 Cal.App.3d 1193, the court upheld a question on the application form asking for the name, address, and telephone number of a responsible party. The court distinguished the matter from *Rosen, supra,* 641 F.2d at pages 1250-1251, which held that the government could not seek prior identification of those who sought to engage in First Amendment activities in a publicly owned airport because such a requirement had a chilling effect on free speech. (See fn. 7, *ante.*) The *H-CHH* court found this question proper because a center's "substantial interests diverge from those of a purely public entity." (*H-CHH, supra,* 193 Cal.App.3d at p. 1211.) The detailed information required in the registration form "provide[d] a reasonably limited means of determining the identity and location of the applicant in the event the [center] finds it necessary to pursue a liability claim." (*Id.* at p. 1210.) A shopping center "need not assume the same degree of risk which a public entity may be asked to bear [in providing a forum for expressive activities.]" (*Id.* at p. 1211.)

In the trial court, the centers submitted declarations to explain the need for identification of all of the participants. Absent having the names in advance,

the center management cannot determine if the individuals who arrive on the day of the expressive activity are actually authorized by the applicant to be there. In the event that there is injury or damage in the course of the activity, prior identification avoids the situation of misidentification of the person responsible and any attempt by the group to claim the person was not, in fact, a member of the group. The identification procedure also permits the center to determine if any of the individuals have previously caused injury or damage. This information gives the center the option of excluding just those individuals as opposed to the entire group and also helps in making the decision about requiring insurance. Lastly, learning the other locations the applicant engaged in similar expressive conduct in the prior years allows the center to verify if there were injuries to person or property on those occasions, another factor relevant in deciding whether to require insurance.

At oral argument, UNITE advanced two arguments as to why the rule requiring prior identification of participants should not be *applied to it*. The first argument was purely logistical. UNITE urged that it draws its activists from a large pool and that it does not know until the particular day which ones will be available to go to a particular center. The centers responded that they would be satisfied with a master list, identifying the pool from whom the individuals would be drawn. Both UNITE's concern and the centers' response appear to be reasonable. Given that UNITE did not raise this point until now and thus offered no evidence to substantiate its claim in the trial court, this matter can best be resolved in the context of the trial on the request for the permanent injunction. The second argument advanced by UNITE was more substantial. Essentially, UNITE expressed concern that if the names of its activists were given to the centers, that information could be disseminated to the detriment of those individuals. Once again, because UNITE did not raise this claim in the trial court, it has offered absolutely no evidence to substantiate this theory. Furthermore, counsel for Glendale Galleria asserted that his client agrees to keep such information confidential. That is, the center would not provide the information to third parties (e.g., Guess?, Inc.). In light of the belated manner in which UNITE has raised this point, the lack of any evidence to support UNITE's theory of retribution, and the centers' apparent willingness to accommodate this concern by keeping the data confidential, this issue is likewise best addressed in the trial court.

Consequently, on the record presented we conclude that it is proper for the centers to learn in advance the identity of the participants and the location of previous actions because this is information which case law has held can be taken into consideration in deciding whether to require insurance, a requirement which may be constitutionally imposed where there is a factual basis

for doing so. If, after receiving this information a center decides to require insurance from an applicant, the center must be able to explain its decision based upon the information submitted by the applicant and any other sources on which it relied. That is, the center must be able to point to the objective criteria which caused it to make its decision. Placing the initial burden of justification upon the center will ensure that in the event the applicant challenges the decision in a judicial proceeding, the factual basis of the center's decision will have been established. This procedure will also give the applicant an opportunity to point out any factual mistakes the center may have made in making its decision and will thus help curtail further litigation.

## 5. Cleaning/Damage Deposit

Two centers—Glendale Galleria and Westside Pavilion—can require an applicant to post a damage deposit in lieu of the insurance requirement. Its predicate is a determination by the center that the proposed activity "poses a risk of damage to property" but the risk is "not one sufficient to necessitate [that the] Applicant obtain[] insurance . . . ." The deposit shall be "sufficient to protect the Center from the risk" of "potential damage."

In light of our prior analysis about identification of participants and requiring insurance, we find no constitutional impediment to this particular requirement. Surely if a center can make an objective determination that insurance is required, it can also make the determination based upon objective criteria that the risk is not so great as to require insurance but that instead some deposit should be forthcoming.

## 6. Prohibition Against Interference With Mall Tenants

UNITE urges that the malls' rules prohibiting interference with a tenant's business could lead to impermissible content-based regulation of expressive activities. That is, UNITE urges that a center could deny UNITE's application on the basis that UNITE's requests that customers not buy Guess?, Inc. jeans constitute an interference with a tenant's business. While this contention raises intriguing constitutional issues, we conclude that the issue has not been properly preserved for review and therefore we do not reach it at this juncture.

UNITE's first amended complaint—the operative pleading at the time of the hearing on its request for a preliminary injunction—did *not* raise this claim. The pleading challenged only the regulations analyzed above. However, the trial court's order to show cause setting the hearing on the preliminary injunction directed UNITE to designate any other regulations it

was challenging. UNITE thereafter filed a notice indicating it was challenging, inter alia, the various rules prohibiting interference with a tenant's commercial operations.

At the commencement of the hearing, UNITE's attorney stated that the only issue was Beverly Center's right to bar it from conducting expressive activities in front of the Guess?, Inc. store and the adequacy of the incomplete applications it had submitted to the other five malls. During the hearing, the court raised its concern about content-based regulation. The attorney representing Del Amo Fashion Center, Glendale Galleria, and Westside Pavilion stated that his clients would not deny UNITE's properly completed application based upon the fact that UNITE was urging consumers not to purchase Guess?, Inc. products.[9] The attorney representing Century City Shopping Center and Sherman Oaks Fashion Square consulted with one of his clients during a recess from the hearing and stated that the client needed a completed application before it could make any decision. (No issue was raised in regard to Beverly Center because it had already given UNITE a permit.) Toward the end of the hearing, the court indicated its belief that the application process was proper and that perhaps it should defer any formal ruling until UNITE submitted completed applications to see if, in fact, any of the centers denied an application based upon content. UNITE's counsel stated: "With respect to that one issue of the content of the leaflet, maybe we could reserve that. But I do want to get moving on this case." Counsel for two of the malls indicated that because the court would retain jurisdiction of the matter inasmuch as this hearing was only on the issue of a preliminary injunction, it would be a relatively easy matter for UNITE to bring the issue to the court's attention were it to arise. When counsel for UNITE reiterated her position that UNITE would not submit complete applications, the court stated: "In that event, the issue of—the remaining issue of the content position is really moot for my purposes and I ought to go ahead and rule following the tentative ruling . . . that I found the application process . . . is sufficient [so I therefore] deny the request for preliminary injunctive relief." Counsel made no objection to the court's decision not to reach the merits of the potential claim of content-based regulation.

The issue was raised in a belated fashion and we decline to address it at this stage of the proceedings. Although the trial court indicated its concerns with the issue at the hearing, UNITE gave it little emphasis. When the court indicated its belief that there was no reason to address the issue given

[9]By letter, counsel for Glendale Galleria had advised UNITE in August 1996 that Glendale Galleria would *not* bar distribution of the leaflet because "the flyer is targeted at the Guess products generally, as opposed to only the tenant."

UNITE's steadfast position that it would not submit completed applications, UNITE did not object. UNITE's primary concern was that the trial court resolve the issues of whether the application process was proper so that it could seek appellate review of that ruling. Given that proceedings are still extant in the lower court (plenary trial on the request for a permanent injunction has not yet been conducted) and that the focus in this writ proceeding is limited (did the trial court abuse its discretion in denying UNITE's request for a preliminary injunction to enjoin the application process), we leave the issue of content-based regulation for another day.

## 7. *Approaching Mall Patrons*

UNITE's petition urges: "The rules adopted [by] The Sherman Oaks Fashion Square seem to leave it up to the management's discretion whether participants will be allowed to approach shoppers."[10] The portion of the record cited by UNITE in its petition does not support this characterization of the rules. The cited rules either prohibit the disruption of business operations or interference with customer convenience or provide that one of the criteria the center will use in deciding whether to permit the expressive activity is whether customers will be approached. The latter rules look to the size of the common area, the nature and area of the expressive activity, and the effect of approaching customers on customer movement and access to the businesses. In sum, there is no rule to review.

### CONCLUSION

The time, place, and manner rules enacted by the centers are constitutional. The questions about insurance, identification of participants, and identification of prior activities are constitutional. The centers can constitutionally impose an insurance requirement or the lodging of a deposit. The centers can constitutionally require prior submission of signs, leaflets, etc. All of the contested rules and regulations are sufficiently content neutral, are narrowly drawn to protect substantial interests, and are applied based upon objective criteria. UNITE's right to access the centers is not absolute. While UNITE would prefer to dictate the terms and conditions of its proposed expressive activities, the centers are not constitutionally compelled to submit to UNITE's wishes. Competing interests are at stake. "Such choices are neither easy nor comfortable. [¶] But that is life. Sometimes beauty is fierce; love is tough; and freedom is painful." (*Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, 938 [59 Cal.Rptr.2d 696, 927 P.2d 1200] (conc. & dis. opn. of Brown, J.).)

---

[10]UNITE did not make this claim in its first amended complaint but waited until after the trial court issued its order to show cause to raise this claim.

Based upon the record presented, the trial court did not abuse its discretion in finding that UNITE had not established the probability of prevailing upon its claims at trial and denying the request for a preliminary injunction. We will therefore deny UNITE's petition for a writ to overturn that decision.

## DISPOSITION

The order to show cause is dissolved. The petition for a writ of mandate is denied. The parties to bear their own costs. (Cal. Rules of Court, rule 56.4(a).)

Hastings, J., and Baron, J., concurred.