735 A.2d 9 (1999)
324 N.J. Super. 192
The GREEN PARTY OF NEW JERSEY, and James Mohn, Plaintiffs-Respondents,
v.
HARTZ MOUNTAIN INDUSTRIES, INC. d/b/a The Mall at Mill Creek, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 1999.
Decided August 3, 1999.
*11 Curtis L. Michael, Secaucus, for defendant-appellant (Horowitz Rubino & Patton, attorneys).
Frank Askin, Newark, for plaintiffs-respondents for the American Civil Liberties Union of N.J. (Rutgers Law School Constitutional Litigation Clinic).
Before Judges PETRELLA, CUFF and COLLESTER.
*10 The opinion of the court was delivered by PETRELLA, P.J.A.D.
Defendant Hartz Mountain Industries, Inc., doing business as The Mall at Mill Creek (Hartz or the Mall), appeals the grant of judgment in favor of the Green Party of New Jersey (Green Party) and James Mohn (collectively, plaintiffs) in litigation challenging the constitutionality of Hartz's regulations regarding persons or groups who wish to distribute leaflets at the Mall. The regulations at issue limited the frequency of any one person's permission to leaflet at the Mall, and required each such person to provide evidence of $1,000,000 in insurance coverage and sign a license agreement containing a "hold harmless" provision.
This case stems from our Supreme Court's 4-3 decision in New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 332, 372, 650 A.2d 757 (1994), cert. denied, 516 U.S. 812, 116 S.Ct. 62, 133 L.Ed. 2d 25 (1995) (Coalition), in which the late Chief Justice Wilentz, speaking for the majority, held that certain regional and community shopping centers, as defined therein (the Mall was a defendant in that case), must permit leafletting on societal issues on their premises, subject to reasonable conditions set by such community shopping centers.
Hartz contends on appeal that the Chancery Division Judge erred in holding the regulations unconstitutional because (a) the Mall is not a traditional or quasi-public forum; (b) the California cases relied upon by the judge are inapposite because they treat shopping malls as public fora; (c) regulations such as Hartz's should be subject only to "a reasonable business judgment standard"; and (d) under either a reasonable business judgment standard or a narrowly drawn standard, Hartz's regulations should be upheld. Hartz further contends that the judge erred in adjudicating the matter at all because the case was and is moot.
The following facts were developed in the proceedings in the Chancery Division. Mohn is a resident of Guttenburg who had been involved with the New Jersey Draft Nader for President Committee (Nader Committee) in 1996, and thereafter with the Green Party in New Jersey. He also was active in membership and voter registration drives and leafletting for other organizations including the New Jersey Peace Action, Witness for Peace, the Arab-American Anti-Discrimination Committee, and the Rainbow Coalition. Mohn characterized these entities as small, poorly financed groups that would distribute informational materials in public places, including shopping malls, when an issue of concern to the organization developed. Mohn anticipated seeking access to the Mall to distribute political literature with some regularity and claimed that the groups with which he was involved would be unable to afford the insurance premiums associated with the Mall's requirement *12 that such groups obtain $1,000,000 in insurance coverage.
The Mall is in Secaucus adjacent to Route 3 on some twenty-seven acres near Interchange 16E of the New Jersey Turnpike. Mohn considered soliciting petition signatures at the Mall important because it was a gathering place for large numbers of people, an enclosed area which was preferable when the weather was bad, and near his home. He and his wife went there about three times a week as part of the Mall's "Merry Milers" to walk for exercise at 8:30 a.m.
The Mall has approximately 325,000 square feet of "gross leasable area," but only about 35,000 square feet of common area open to the public. According to Hartz's Assistant Vice President of Retail Leasing, Hartz licensed up to ten kiosks or pushcarts to various vendors for use in the common area and required such lessors to submit a certificate of insurance for $1,000,000 in coverage. Hartz placed the kiosks to provide for a reasonable thoroughfare for the Mall's customers, and to comply with applicable building codes that required, among other things, a ten-foot egress corridor and a twenty-foot clearance around certain structures. The Mall's single-floor layout is roughly a straight line passageway between anchor stores (a supermarket and a discount department store) on either end and lined by stores on either side, with enlarged common areas at each end and midpoint. After allowing for the clearance required by the building code, there is limited space for kiosks, carts or tables in a narrow band of common area at the center of the passageway, and in the three enlarged areas. Those spaces also hold movable planters, movable benches, directory structures, seasonal displays, an information desk and some permanent rides for children.
On September 27, 1996, Mohn wrote on behalf of the Nader Committee, to Marilyn Mangan, Hartz's Marketing Director, requesting space to set up an information table at the Mall. In accordance with Hartz's standard practice, Mangan forwarded Mohn a copy of its license agreement and regulations. Mohn signed the license agreement and faxed it back to Hartz, listing October 26 or 27 as the dates requested. Maranda Ashkar, Hartz's Retail Marketing Coordinator, who was responsible for reviewing and approving license agreements for nonprofit organizations desiring to use space at the Mall, wrote Mohn on October 14, 1996, informing him that the Mall would hold the October 27 date open, pending receipt by October 21, of the insurance certificate, cleanup deposit, and the original license agreement.
Hartz's regulations as sent to Mohn were contained in a two-page document captioned "Regulations of the Mall at Mill Creek for Non-Profit Informational Activities," and provided, in pertinent part:
The following comprise the regulations of the Mall at Mill Creek for informational activities of non-profit organizations, individuals, or entities (collectively "Permittee"). The Mall at Mill Creek has afforded reasonable access for community and non-profit groups desiring to use the Mall for informational activities. However, informational activities must be conducted in a manner so as not to disturb Mill Creek's customers or tenants. Mill Creek reserves the right to change these rules at any time.
1. Activities are generally limited to one day per year between January 1 and October 31, unless otherwise approved by Mall Management upon written request.[1]

* * * *
9. Permittee must provide a valid Certificate of Insurance, including general *13 liability insurance in the combined single limit of $1,000,000. The certificate must contain an endorsement in the form contained in the License Agreement.
10. Permittee must sign the enclosed License Agreement.
Other regulations not at issue in this appeal require that (a) the organization provide its own table, covered to the floor on all sides; (b) have professionally printed signs; and, (c) submit a $100 cleanup deposit which "will be refunded if no unusual cleanup is required upon completion of Permittee's activities." The regulations incorporated many of the rules applicable to commercial temporary vendors at the Mall.
The license agreement referenced in the regulations required the Permittee to agree to abide by the regulations, and further provided:
Licensee shall protect, indemnify, save and keep harmless Licensor against any and all claims, loss, cost, damage or expense of any kind or nature, whatsoever, arising out of or from (i) any accident or occurrence in, on or at the Premises, and (ii) any act or omission of Licensee, its employees, servants, agents or invitees. In the event the Mall or Hartz shall, without fault on its part, be made a party to any litigation commenced by or against Licensee, Licensee shall protect and hold the Mall and Hartz harmless and shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by the Mall or Hartz in connection with such litigation.
The license agreement also required an insurance endorsement naming "Hartz Mountain Industries, Inc. and its respective subsidiaries, affiliates, associates, joint ventures and partnerships as additional insured. It is intended for this insurance to be primary and non-contributing."
On October 14, 1996, Mohn obtained for the Nader Committee a quotation of $665 ($500 in premium plus $165 in fees and taxes) from the Retcho Agency for $1,000,000 in liability insurance for the day's activities at the Mall. Kerry Jeffers of the Retcho Agency assertedly told Mohn this quotation would cover leafletting and petitioning only at the Mall, and there would be additional charges for coverage for such activities at other malls.
Mohn and the Nader Committee then filed suit on October 21, 1996 and sought and obtained temporary relief in the Chancery Division in an October 25, 1996 order to show cause, which allowed them to leaflet at the Mall on October 27 without providing an insurance certificate. Hartz stipulated that it had no information about any claims having been filed as a result of the leafletting activities at the Mall on October 27. Mohn further certified that when he leafletted at the Mall in 1996 for the Nader Committee, the activity was conducted without incident.
In March 1997, Mohn was in the process of establishing the Green Party which had been organized in New Jersey on January 25, 1997, at a meeting of about forty people at the Rutgers Labor Education Center in New Brunswick. At that meeting, the invitees, who had been members of the Nader Committee, declared themselves as the Green Party.[2] In order to minimize the potential for challenge to their petition, the Green Party sought to acquire about 2,000 signatures, rather than the 800 required by law, on the nominating petition for its gubernatorial candidate in 1997.
While seeking petition signatures in locations other than the Mall, Mohn had handed out a two-page document that described the Green Party, its candidate and positions. Mohn intended to use that document in his leafletting and petition signature collection at the Mall if granted access. The leaflet did not make any reference to Hartz relating to Green Party's *14 positions about corporate concentrations of wealth, nor did Mohn intend to do so during leafletting at the Mall. Mohn explained that the Green Party was "not anti-corporate, we are anti-corporate control," meaning that the members do not contest a corporation's right to exist or operate, but to control politically and economically through the power of their contributions.
According to a certification by plaintiff's then-attorney, he spoke with Jeffers on February 13, 1997, regarding the insurance quotation previously given to the Nader Committee and was told that she had never seen a lower premium for a commercial excess line insurance policy than the $500 premium quoted in October 1996; she also told him that the policy fees and taxes were standard. The attorney subsequently spoke to Jeffers and Joseph Retcho, who managed the agency, and they were preparing a quotation for the Green Party for the same $665 cost for the insurance coverage.
In March 1997, Mohn learned from his homeowner's insurance company that his personal homeowner's policy would not cover the group's leafletting activities at the Mall. His personal umbrella policy would cover his activities, but not that of the Green Party or the Mall. Mohn's personal ability to pay the $665 for insurance coverage was not considered because he claimed the Green Party's rules would not permit contributions over $250 and a personal payment of the insurance premium would violate those rules.
William Colucci, Green Party Chairman, stated that the party set up a political action committee and a bank account and he was a signatory for both. However, he said that the Green Party would not be a recognized political party under New Jersey law until it received 10% of the vote at an election. As of March 12, 1997, the Green Party had $180.39 in a bank account, no other assets or funds, and debts or obligations of about $400. He said the Green Party did not have any insurance policies of any kind and did not have the resources to purchase liability insurance coverage that would cost $665. Although the party was requesting that members pay five dollars in annual dues at the March 22, 1997 meeting, he realized that most of that money had already been spent, and he was uncertain how the party would raise additional money. He confirmed that the party had a policy of limiting contributions from individuals to $250 and of accepting no money from organizations. Even if the party was able to raise in excess of $665 in the upcoming months, Colucci did not believe that the party would or should spend that money on insurance for leafletting for one day in a mall because "we have a lot of activities we could do that would further our cause greater than access one day at a mall." When asked whether leafletting at the Mall was that important, Colucci stated that it was because the group needed signatures to get its candidate on the ballot. He added that the Green Party "would probably have other priorities in spending $600."[3]
Richard Lofberg, a chartered property and casualty underwriter with Clarence Lofberg Insurance Service, testified as Hartz's expert in insurance underwriting and specifically insurance with respect to tenants, vendors and other users of shopping malls. Lofberg explained that malls invariably require insurance of their tenants and vendors for these reasons:
A mall is open to the public, it is a private location, a private site, because it is a private site the owner of that property is literally fully exposed to anything that happens, the slip and falls in shopping malls are horrendous, the rights of *15 protection are really somewhat limited, considering what can happen there, a person walking through a mall taking a shortcut across the street, slips and falls and we have the suit against the mall, the exposures are horrendous. The bodily injury claims that result from them, many of which can't even be proven because there may not be any witnesses, tend to create tremendous hazards to any mall owner. It is a high risk business, it sounds like an easy one, but it's a high risk business.
Lofberg explained that insurance was readily available for those risks "at a price" and that where a group is financially strong enough to carry part of that risk itself, it can use a "self-insured retention," also called a high deductible, to lower its insurance costs on a per claim or a per period basis.[4] Another way to achieve that goal would be to use retrospective contracts where, after a deductible amount is reached, the insurer pays the full extent of the claim incurred and charges the insured a fixed percentage above the actual cost of a claim.
Because under either the self-insured retention or retrospective contract the shopping mall retains a substantial amount of risk, the mall requires tenants and vendors to obtain insurance to cover injuries arising in their leased areas. This approach leaves the mall owner responsible for the common areas. However, a mall owner may require the service responsible for waxing the floors to provide a certificate of insurance so that claims relating to a floor made too slippery would be borne by that service provider, including the costs of the claims made against the mall owner. Lofberg agreed that the mall could try to increase its rents to cover this additional expense, but when that approach had been tried in the past, it did not work too well.
Lofberg explained that the certificate of insurance is an affirmation by the insurance producer that a policy of a specific type has been issued to a named insured for specified policy limits on specified terms, such as on an occurrence basis. Lofberg noted that a certificate of insurance might also set forth whether the underlying policy included contractual assumption of liability as to bodily injury and property damage; in such cases, if a person signed Hartz's hold harmless agreement, Hartz could be protected under the person's homeowner's, tenant's or umbrella personal insurance policy. Lofberg was familiar with the policies issued by the insurer for Mohn's homeowner's policy and said it included coverage for all personal, non-business activities of the insured, which would include participation as a volunteer leafleteer. Furthermore, if Mohn signed the hold harmless agreement, that contractual obligation would automatically be covered under Mohn's policy. Lofberg disagreed with the advice Mohn had been given that he would not be covered and added that there is no cost to obtain a certificate of insurance. Lofberg recognized, however, that neither the standard personal liability coverage, such as provided under Mohn's homeowners' policy, nor the standard personal umbrella policy, would allow the insured to purchase additional insured coverage in the form required by paragraph five of Hartz's license agreement. He further recognized that Hartz's license agreement anticipated that the Green Party, not an individual, would be the licensee, and that neither Mohn's homeowners' policy nor his umbrella policy would cover the Green Party or its members who were not members of Mohn's household.
Lofberg reviewed the Nader Committee's quote from the Retcho Agency and observed that it was a commercial quote for coverage by Mount Vernon Fire Insurance *16 Company, a non-admitted company. He explained that a non-admitted company generally does not do business in New Jersey, but is permitted to write specific forms of coverage that are not otherwise available in the state. Lofberg knew that standard insurers would insure the regular activities of small political organizations in the state, such as local political parties, for an annual premium of $250, although he was not quite sure what was covered. He indicated that leafletting at the mall would involve having "a large flow of people coming down a common area," so the exposure could be above the $250 premium that standard market insurers would cover. Non-admitted insurers, he claimed, were free to charge more. Lofberg added that mall tenants could usually obtain coverage in the standard market because they would be paying an annual premium of between $10,000 and $50,000, but that vendors at the mall were usually covered by the non-admitted insurers because they paid only a small premium for a lot of risk.
Lofberg observed that the insurance quotation received by the Nader Committee did not contain a policy provision limiting the leafletting activities to one day, so the $500 premium cost appeared to contemplate coverage for a full year at the Mall; he asserted that coverage for only one day would be rated differently. He also said the $150 inspection fee above the base premium cost seemed about $100 too high. Lofberg considered Hartz's requirement for $1,000,000 of coverage to be reasonable, if not low, considering that this was for the group's activities on private property owned by others. Lofberg believed that assuming ability to pay the premium, there was no problem with the availability of this type of coverage.
Lofberg was not aware of any legal requirement that political parties have liability insurance for leafletting or petition signing activities, but he would advise that the Green Party have such coverage wherever they conducted those activities. He explained that slip and fall claims were the greatest risks in shopping malls, and that these accidents occurred with the same frequency per square foot throughout a mall, regardless of the type of surface that was walked upon or the size of the space.[5] Asked about the frequency of claims against the Mall since July 1993 compared with his experience elsewhere, Lofberg explained that he had some clients who faced a similar number of claims in one quarter the amount of floor area.
After hearing this testimony the Chancery Judge entered a March 14, 1997 order granting plaintiffs' request for permission to leaflet and gather petition signatures at the Mall on March 16, without obtaining a certificate of insurance.
Plaintiffs moved for summary judgment in January 1998. Both parties supplied additional information about the Mall's experience with nonprofit activities.
Since 1995 the Mall had entered into license agreements with various organizations. Each of those organizations had provided a certificate of insurance naming Hartz as an additional insured as required by the license agreement. Hartz's retail sales marketing coordinator could not recall anyone seeking permission to use the Mall without providing the certificate of insurance. Whether a group could use space at the Mall on a requested date depended in large part on whether there was something else going on at the Mall, such as a show or another group in the same location. Specifically, the marketing coordinator was asked about a licensing agreement for the North Jersey 4-C's group for November 17. She believed that they were permitted to come in after the October cutoff date in the regulations because Santa Claus did not arrive until the *17 following week and the space had not been rented out to anyone else.
Hartz's marketing director had granted permission to organizations to return for an additional day when the group felt that there had not been sufficient attendance at the Mall on the day they had requested. She had also granted permission for one organization to use space in the Mall for seven days because the Mall's general manager was familiar with the organization and asked Mangan to waive the "one day per year" regulation. Based upon that experience, Mangan said she would be more inclined to grant permission for groups to use the Mall for more than one day. According to Hartz's representative, even though fund-raising was prohibited under Hartz's regulations, Hartz would try to cooperate with these groups, such as the American Cancer Society, as long as they did not walk around the mall and solicit donations from customers. The marketing director said as far as she knew the insurance requirement and the cleanup deposit had never been waived. She was aware of occasions where two groups had been at the Mall on the same date, which she permitted because both groups were small, each bringing only two people, and she did not think they would conflict.
Lyons explained that arranging the temporary vendor space was particularly important during the holiday season (i.e., from Thanksgiving through New Years) when pedestrian traffic was at a peak, common area floor space was at a premium due to seasonal displays, and there was a high use rate by temporary vendors. Given these considerations and the Mall's physical limitations, Lyons concluded that it was "not reasonable to allow informational groups to set their table during the holiday season, and still conform to code requirements while maintaining a desirable atmosphere."
Lyons had turned away a number of individuals who sought to lease kiosks or vendor carts in the Mall during the 1995, 1996 and 1997 holiday seasons, because all of the floor space for kiosks and carts were occupied. Lyons explained that because the Mall was forced to turn away paying tenants during the holiday season, it was unreasonable to allow nonpaying, nonprofit groups to use space during this period.
According to Anita DiGiulio, Hartz's Director of Insurance and Risk Management, the Mall's tenants were required to have insurance coverage at policy limits of $5,000,000 per occurrence and the leases usually had a hold harmless provision. In her three years of involvement with Hartz, DiGiulio was not sure whether Hartz had ever been required to pay a claim for an injury within a leased property. She knew that there were instances where, to cover amounts that Hartz had to pay for claims under its deductible, Hartz would pursue indemnification from contractors or tenants, or their insurance companies, under the additional insured coverage that Hartz required. She noted that Hartz had a per-occurrence deductible and supplied a three-page listing of claims that the Mall had experienced for incidents that occurred between July 1993 and June 1996, from which the claims paid and expenses totalled $497,507.38. Most of the claims were for less than $35,000 each, but there were two large claims in 1993 where the claims and expenses totalled $220,000 and $101,030, respectively.
In response to a request for admissions, Hartz admitted: "[d]uring the past three years, the Mall has allowed some groups to use the Mall for non-profit informational activities for more than one day per year"; "on one isolated occasion" two groups were allowed to use the Mall on the same day; "on one isolated occasion, one group was allowed to use Mall between October 31 and January 1"; the Mall "has responded to oral requests for deviations from the regulations"; Hartz's marketing directors "have the discretion to waive one or more of the regulations" and had "from time to time, waived one or more of the regulations for different groups"; Hartz had only once been notified about concerns *18 stemming from a group's use of the Mall facilities when balloons were used by a group; Hartz was unaware of any injury to any individual or property from the distribution of printed materials by groups conducting non-profit informational activities in the Mall. For the three years since 1995 the Mall's security guards have never had to respond to any customer complaints about groups' use of the Mall for non-profit information activities and Hartz was not aware of the police having to respond to any problems due to the groups' use of the Mall for such activities. Hartz was unaware of any claims against the Mall from non-profit informational activities at the Mall.
Mohn also certified that when he leafletted and sought ballot petition signatures at the Mall in 1997 for the Green Party, the 300 petition signatures were obtained without incident.[6]
According to the Green Party's treasurer, in February 1998 members were asked to pay dues of at least $25 per year, but with the understanding that if someone did not have the money, they would not have to pay. As of February 1998, Hutchison believed that there were more than 100 members paying dues, but less than 200. At that time, the Green Party had no paid employees. It paid rental fees for using the Labor Education Center in March 1997 for the founding meeting and an Internet web site provider fee of $25 per month. The Green Party had no headquarters at that time, but was exploring renting office space in Trenton and discussing a fund-raising goal for the year of between $10,000 and $20,000. The records the treasurer produced indicated that the Green Party at that point had revenue of $6,444.78 and debts of $3,753.83, leaving a net of $2,690.95.
The treasurer explained that its money was being earmarked for two purposes, for its gubernatorial candidate's expenses and publication of brochures. Even at this point he did not believe the Green Party could afford the $665 insurance cost. He thought they should not have to pay insurance "in order to get our message out on the public common," and that, from a cost benefit analysis, "we have to devote $650 to more important things. I shouldn't have to waste $650 in order for us to facilitate giving out our literature. I think it's guaranteed in the Constitution. There's nothing about insurance."
Prior to January 16, 1998, Hartz revised its first numbered regulation for nonprofit informational activities to provide: "Activities are generally limited to one day, or a few consecutive days per year, between January 1 and October 31, upon approval by Mall management."
In an August 28, 1998 opinion Judge Greenberg indicated he would decide the issues even without an active case or controversy, because they were of substantial public importance, were capable of repetition, and had not as yet been judicially reviewed in this state. He compared the United States and New Jersey constitutional freedom of speech provisions,[7] and *19 the Coalition decision (138 N.J. 326, 650 A.2d 757). The judge also reviewed three California cases that had addressed shopping mall restrictions,[8] which he construed as applying the same standard that the United States Supreme Court cases apply to governmental restrictions on freedom of speech in a traditional public forum, namely that the government may impose reasonable content-neutral time, place and manner restrictions on freedom of speech, but that those restrictions must be narrowly drawn to promote its substantial interests. The judge adopted that standard for reviewing regulations imposed by private shopping malls in New Jersey, interpreting the rationale of the Coalition majority as meaning that in New Jersey "a shopping mall is a de facto traditional public forum."
Judge Greenberg applied that standard to Hartz's regulations, finding that the frequency limitation, either as originally drafted, or as amended, was unreasonable and not narrowly drawn to serve Hartz's stated interest, which he viewed as ensuring "that one group does not monopolize the area to the exclusion of others." The judge said no proofs suggested that the regulation promoted a substantial interest that would be achieved less effectively absent the regulation.
The insurance and hold harmless requirements were apparently considered together. The judge observed that the majority opinion in Coalition had noted the importance of small grass roots groups in a free society. The judge then compared the $665 per year cost of the insurance required by Hartz's regulation to the Green Party's bank balances as of the two occasions it sought to leaflet at the Mall, $180 and $2,600, respectively. The judge considered the insurance requirement cost-prohibitive to the Green Party on the first occasion, and affordable, but nevertheless an onerous cost considering its limited funds on the second occasion.[9]
The Chancery Judge said, without record support, that many political groups are unable to secure insurance at any price, relying on a case involving the Connecticut Department of Transportation's insurance requirement to use state property. In particular, the judge cited a footnote that suggested an insurance requirement may raise other constitutional issues, particularly if underwriters consider such matters as the political beliefs of applicants, the likelihood of adverse publicity to the insurer, the lack of business experience of the group, and other factors that are irrelevant or improper. Eastern Conn. Citizens Action Group v. Powers, 723 F.2d 1050, 1056 n. 2 (2d Cir.1983). Judge Greenberg then concluded that the insurance and hold harmless requirements were unconstitutional "as a de facto ban on free[dom of] speech because compliance, if achievable, is cost prohibitive."
The judge thus did not consider it necessary to decide whether the insurance and hold harmless requirements constituted reasonable time, place and manner regulations. But, he went on to state that if it did reach that issue he would find the requirements constitutionally unreasonable because "Hartz could not reasonably have determined that its interest overall would be governed less effectively without an insurance and hold harmless requirement." The judge seemed to rely on *20 Znoski v. Shop-Rite Supermarkets, Inc., 122 N.J.Super. 243, 248, 300 A.2d 164 (App.Div.1973), as holding that a shopping mall is not strictly liable for injuries occurring on its property. He thus stated, somewhat erroneously, because he overlooked potential tort theories such as negligent supervision, failure to require insurance, agency claims, and the cost of defense, whether of bona fide or of even frivolous claims:
The Mall at Mill Creek has no reason to believe that if an accident were to occur as a result of non-profit activities, that the Mall will be held liable for the negligence of non-profit groups engaging in non-profit informational activities. As a matter of law, the Mall could only be held liable for its own negligence. Thus, requiring an insurance policy to insure the Mall against plaintiffs' negligence would be meaningless and the Mall reasonably could not have determined that its interest could not be served without the insurance requirement.
The judge also stated that two other issues raised in the motion, regarding a "black-out" period during the holiday shopping season and a one group per day restriction, were not pled in the complaint and, therefore, were not properly before the court on the summary judgment motion. In his opinion, the judge noted, however, that if these issues had been reached, he would have found each to be valid, as they were narrowly drawn to enable Hartz to keep common areas open, available for movement, and safe, in view of evidence regarding the Mall's limited amount of common space.

I.
Hartz contends that this case should be dismissed as moot because, as the motion judge recognized, there was no actual case in controversy at the time of the decision on the summary judgment motion and proceedings, and as the motion judge and the Court in Coalition, supra, 138 N.J. at 378, 650 A.2d 757, noted, this type of case turns heavily on its facts and circumstances.
Hartz is correct in stating that determining the validity of its regulations involves consideration of the facts presented on each occasion. However, the issues are likely to recur and hence we address the merits of the appeal, notwithstanding the mootness of the case. See, e.g., Zirger v. General Accident Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996); Division of Youth & Family Services v. J.B., 120 N.J. 112, 118-119, 576 A.2d 261 (1990).

II.
Hartz contends that the Chancery Judge erred in holding that its regulations relating to frequency, insurance, and the hold harmless agreement for non-profit organizations using the Mall property are unconstitutional. It asserts that the judge initially erred by applying the wrong standard, because he applied cases that equated shopping malls with "traditional public fora," and this is not the proper approach in New Jersey. Thus, Hartz asserts that the judge's inquiry into whether each regulation was "narrowly tailored" to the needs to be served by it was error because a "reasonable business judgment" standard should have been applied. Applying either standard, however, Hartz contends that all three regulations should have been upheld. Plaintiffs rely on the "narrowly tailored" standard employed by the motion judge. However, the language in the majority opinion of Coalition, supra, 138 N.J. 326, 650 A.2d 757, leads us to conclude that neither formulation is a correct statement of the standard to be applied to a shopping center's regulation.
This appeal arises in part from what purports to be a grant of summary judgment, although the judge also heard testimony and made findings. Hence, the judge converted the matter into a summary proceeding. See R. 4:46-3; R. 4:67-1. The judge in the summary judgment aspect was required to "consider whether *21 the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995). We apply the same standard of review as to the summary judgment aspect. Antheunisse v. Tiffany & Company, Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989).
The Coalition decision was expressly "limited to leafletting and associated speech in support of, or in opposition to, causes, candidates and partiespolitical and societal free speech," and affirmatively ruled that our State Constitution does not confer freedom of "speech rights at regional and community shopping centers that go beyond such speech." Id. at 374, 650 A.2d 757. The motion judge held that the Coalition reasoning included solicitation of signatures on political petitions.
The issue in Coalition, supra, 138 N.J. 326, 650 A.2d 757, was whether the New Jersey Constitution's freedom of speech provision permitted persons or groups to distribute leaflets at the defendants' shopping malls. Id. at 332, 650 A.2d 757. The Court had previously described the New Jersey Constitution's freedom of speech clause (see footnote 7, supra [actually the right to freely speak or publish one's sentiments, subject to responsibility therefor]) as "more sweeping in scope than the language of the First Amendment" and thus protected freedom of speech "not only against governmental or public bodies, but under some circumstances against private persons as well." State v. Schmid, 84 N.J. 535, 557, 559, 423 A.2d 615 (1980), appeal dismissed sub. nom. Princeton University v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). The Coalition majority reviewed and declined to follow cases that made clear that the Federal Constitution afforded no general right to freedom of speech in privately owned shopping centers. Coalition, supra, 138 N.J. at 347-349, 650 A.2d 757. Applying the State Constitution under the Schmid rationale, however, the Coalition majority held that certain shopping centers, including the Mall, must permit leafletting on societal issues "subject to reasonable conditions set by them." Id. at 332, 650 A.2d 757. The majority said that "[a]lthough the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district, including expressive uses and community events." Id. at 333, 650 A.2d 757. The late Chief Justice Wilentz wrote that these shopping centers "significantly compete with and have in fact significantly displaced downtown business districts as the gathering point of citizens, both here in New Jersey and across America," id. at 344, 650 A.2d 757, adding "[t]hus, malls are where the people can be found today." Id. at 345, 650 A.2d 757.
Coalition discussed the holding in Schmid, supra, 84 N.J. 535, 423 A.2d 615. Schmid, though lacking permission from Princeton University, could not be convicted of trespassing because he entered the campus, distributed leaflets, and sold political materials. Coalition, supra, 138 N.J. at 352, 650 A.2d 757. Coalition held:
that the free speech sought by the plaintiffthe non-commercial leafletting and its normal accompanying speech (without mega-phone, soapbox, speeches, or demonstrations)be permitted by defendants subject to such reasonable rules and regulations as may be imposed by them. This free speech can be, and we have no doubt will be, carefully controlled by these centers. There will be no pursuit or harassment of shoppers. Given this limited free speech right leafletting, given the centers' broad power to regulate itand given experience elsewhere, we are confident that it is *22 consonant with the commercial purposes of the centers and the varied purposes of their shoppers and non-shoppers. [Emphasis supplied.]
[Coalition, supra, 138 N.J. at 334-335, 650 A.2d 757.]
The Coalition majority opinion noted that then-Justice Schreiber's concurrence in Schmid questioned whether the constitutional holding in that case was based on "`a balancing process'" or on the university's "`dedication to the public of its property'"; Justice Schreiber believed that only dedication of private property "`for a public use involving public discussion'" could justify the Schmid holding. Id. at 355, 650 A.2d 757 (citing Schmid, supra, 84 N.J. at 576, 580, 423 A.2d 615). The Coalition majority said it did not need to "examine what a dedication to the public for public discussion really means, for there is no property more thoroughly `dedicated' to public use than these regional and community shopping centers, a public use so pervasive that its all-embracing invitation to the public necessarily includes the implied invitation for plaintiff's leafletting." Ibid.
In Schmid, supra, 84 N.J. 535, 423 A.2d 615, the majority described its standard as taking into account:
(1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.

[Id. at 563, 423 A.2d 615.]
The Schmid Court stated that this test "must be applied to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly." Ibid.
In applying the first two parts of that analysis, the Coalition Court said:
The regional and community shopping centers have achieved their goal: they have become today's downtown and to some extent their own community; their invitation has brought everyone there for all purposes. Those purposes in factregardless of their clear subjective profit motivego far beyond buying goods; they include not only expressive uses but so many different uses without any commonality other than the mix of uses that define a community, and in terms of the centers' motivation, almost anything that will bring people to the centers. This is the new, the improved, the more attractive downtown business districtthe new communityand no use is more closely associated with the old downtown than leafletting. Defendants have taken that old downtown away from its former home and moved all of it, except free speech, to the suburbs. In a country where free speech found its home in the downtown business district, these centers can no more avoid speech than a playground avoid children, a library its readers, or a park its strollers.
[Coalition, supra, 138 N.J. at 360-361, 650 A.2d 757.]
Applying the third part of the analysis and finding leafletting presumptively compatible with shopping centers, then Chief Justice Wilentz added:
These centers have full power to minimize whatever slight discordance might otherwise exist; full power to adopt rules and regulations concerning the time, place, and manner of such leafletting, regulations that will assure beyond question that the leafletting does not interfere with the shopping center's business while at the same time preserving the effectiveness of plaintiff's exercise of their constitutional right.

[Id. at 362, 650 A.2d 757.]
Coalition commented that the availability of mass media, such as television, had not diminished the need for access to public business districts for leafletting; if *23 anything, it had increased the need, by assertedly giving voice only to majority viewpoints. Id. at 367-368, 650 A.2d 757. The Coalition majority noted a recent amendment to the New Jersey Constitution allowing for recall of public officials (N.J. Const. art. I, ¶ 2b, effective January 1, 1994), and that the amendment required a significant number of petitioner signatures for the various categories of officials. The Court considered that the defendant shopping centers were "the most likely places for realizing the goals of such laws, and perhaps the only practical place." Id. at 370, 650 A.2d 757.
The Coalition Court emphasized that its holding was "limited to leafletting and associated speech in support of, or in opposition to, causes, candidates, and parties political and societal" freedom of speech. Id. at 374, 650 A.2d 757. It further asserted that the manner of permissible speech "does not include bullhorns, megaphones or even a soapbox; it does not include placards, pickets, parades, and demonstrations; it does not include anything other than normal speech and then only such as is necessary to the effectiveness of the leafletting." Id. at 376-377, 650 A.2d 757. The Court's ruling also did not permit the sale of literature or the solicitation of funds (except for appeals contained in the leaflets themselves), but it did not preclude the center owners from granting greater rights or enacting further limitations. Id. at 376, 650 A.2d 757.
The Court added:
The centers' power to impose regulations concerning the time, place, and manner of exercising the right of free speech is extremely broad. We assume that in most cases malls can limit the time of leafletting to specific days, and a specific number of days. Certainly no individual or group will be entitled to be present any more often than is necessary to convey the message. Under some circumstances, however, a limitation to certain days may constitute an unreasonable regulation. For instance, a blanket prohibition against leafletting on the Saturday or Sunday before an election may be unreasonable. In addition, an otherwise innocuous day restriction may be unreasonable given peculiar characteristics of the speaker or the cause. Depending on the circumstances, and all of these comments depend on the circumstances, it may be necessary, as here, that if only one day is sought or permitted, the speech be permitted a fair portion of that day.

[Id. at 377-378, 650 A.2d 757.]
Synthesizing these statements, and drawing from the Court's statements applying the third part of the Schmid analysis, id. at 362, 650 A.2d 757, the standard for reviewing shopping centers' regulations can be viewed as a multi-part test: (1) Is the regulation a reasonable means for assuring a private business, operating as a regional shopping center, that the constitutionally permitted freedom of speech activity does not interfere with the shopping center's business? In other words, was the regulation a reasonable exercise of business judgment? (2) Applying the regulation to the circumstances presented, is the effectiveness of the applicant's proposed exercise of freedom of speech rights sufficiently maintained? If the answer to both questions is yes, the regulation is reasonable under the Coalition decision.
Our formulation differs from the "narrowly tailored" test used by the Chancery Judge, which we reject. To import a "narrowly tailored" formulation would be inconsistent with the Coalition Court's decision. The judge erroneously adopted the "narrowly tailored" test by accepting as persuasive authority certain California cases where freedom of speech issues relating to shopping centers were addressed. These included Robins v. Pruneyard Shopping Ctr., 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), aff'd, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), where the majority of the court concluded that Article I, section 2 of California's constitution *24 [10] protects reasonably exercised speech and petitioning in shopping centers, even where privately owned. Id. at 860, 592 P.2d 341. Pruneyard stated that California's constitution "broadly proclaims speech and petition rights" and that "[s]hopping centers to which the public is invited can provide an essential and invaluable forum for exercising those rights." Ibid.
Subsequently, in H-CHH Assocs. v. Citizens for Representative Gov't, 193 Cal. App.3d 1193, 238 Cal.Rptr. 841, review denied (Oct. 29, 1987), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988), a case involving a challenge to a shopping center's regulations, the California appeals court said that Pruneyard "did not establish a new standard of reasonableness to be applied to private property." Id. at 850. Instead, the court asserted that Pruneyard, supra, 23 Cal.3d 899, 153 Cal. Rptr. 854, 592 P.2d 341, and In re Hoffman, 67 Cal.2d 845, 64 Cal.Rptr. 97, 101-102, 434 P.2d 353 (1967), required time, place and manner regulations to be "narrowly focused in the traditional manner." H-CHH, supra, 238 Cal.Rptr. at 850. The H-CHH court noted that in those cases the shopping centers were privately owned but "quasi-public" forums. However, in the case before it the California appeals court considered the public nature more pronounced because the City of Pasadena had obtained the shopping center's property through eminent domain, financed the parking facilities through its redevelopment agency, and received rent for the parking facilities' use. Id. at 851. The Coalition Court majority cited H-CHH as in accord with its conclusion that sales of literature and solicitation of funds need not be permitted by the shopping centers, but did not cite or discuss it regarding the standard for reviewing shopping center regulations. Coalition, supra, 138 N.J. at 376, 650 A.2d 757.
In Union of Needletrades, Indus. & Textile Employees v. Superior Court, 56 Cal.App.4th 996, 65 Cal.Rptr.2d 838, 841 (1997) (UNITE), the California Court of Appeal addressed a situation where the issue was whether a particular shopping center's regulations were reasonable. The plaintiff union in that case had a dispute with the working conditions of a particular clothing manufacturer. As a result, it sought to picket and hand out leaflets in six shopping malls in front of the manufacturer's stores. The case involved review of several regulations, including the mall's prior approval of signs, a day limitation, an area designation, an insurance requirement, a cleaning deposit, and a prohibition against interference with customers, promulgated by the malls after a request to enjoin the malls from enforcing the regulations was denied. Id. at 841-842. The court did not impose a narrowly tailored standard. Rather, it held that the malls could establish objectively reasonable regulations. Id. at 856.
Even accepting that characterization of a shopping mall as "a de facto traditional public forum," the conclusion that the Coalition majority intended to engraft federal constitutional standards to a perceived broader New Jersey constitutional provision is not warranted, particularly when its opinion was framed to avoid application of federal constitutional standards. The Coalition decision's repeated use of language of a broad power to regulate, see 138 N.J. at 335, 364 and 377, 650 A.2d 757, simply does not square with a narrowly tailored test. Rather, a multi-part test, as was synthesized above, appears more accurately to follow the Coalition rationale. Hence, we reject the Chancery Judge's use of a narrowly tailored test.

III.
Application of the standard for reviewing reasonableness of the Mall's regulations *25 derived from the Coalition decision requires us to address the frequency limitation.
As noted, the Coalition majority indicated that a frequency limitation would be acceptable, if reasonable under the circumstances. The Court acknowledged that "in most cases malls can limit the time of leafletting to specific days, and a specific number of days." Coalition, supra, 138 N.J. at 377, 650 A.2d 757. A single-day limitation was clearly contemplated when the majority stated that "it may be necessary, as here, that if only one day is sought or permitted, the speech be permitted a fair portion of that day." Id. at 378, 650 A.2d 757. The Court also stated that "[c]ertainly no individual or group will be entitled to be present any more often than is necessary to convey the message." Id. at 377-378, 650 A.2d 757.
As observed, the Coalition opinion acknowledged "extremely broad" power to impose time, place and manner regulations. Id. at 377, 650 A.2d 757. Of course, the shopping mall is permitted to provide greater access if, based on objective criteria, it believes that more time would be needed to serve a particular request. Coalition also stated that "a blanket prohibition against leafletting on the Saturday or Sunday before an election may be unreasonable." Id. at 378, 650 A.2d 757.
In the present case, the Mall's regulation survives scrutiny as a reasonable business means for assuring that the free speech activity does not interfere with the shopping center's business. By generally allowing presence in the Mall for "one day, or a few consecutive days per year," the Mall's regulation, as amended, fits squarely within the Coalition Court's assumption that "in most cases malls can limit the time of leafletting to specific days, and a specific number of days." Coalition, supra, 138 N.J. at 377, 650 A.2d 757. Moreover, the regulation was the sound exercise of business judgment in that it permits the Mall, a commercial enterprise, to lease the space to paying vendors.
As to the second aspect of the test, applying the frequency limitation does not undermine the effectiveness of any freedom of speech rights of plaintiffs. The Green Party obtained the requisite signatures to have its gubernatorial candidate placed on the ballot, having used space in the Mall only once. Hartz's management has allowed groups to use the Mall more frequently, especially if a group could not achieve its goals due to insufficient Mall attendance on its scheduled date. Under all of these circumstances, there was no support for the Chancery Judge's holding that the frequency requirement was unreasonable.
Accordingly, Hartz's frequency regulation, as amended, is reasonable and we reverse the judgment on that issue.

IV.
We turn next to the more troublesome issue of required insurance. The Coalition Court noted that three of the defendant shopping centers, including the Mall, required proof of liability insurance in the amounts of $1,000,000 for bodily injury and $50,000 to $1,000,000 for property damage. Id. at 337, 650 A.2d 757. Although the plaintiffs in that case challenged the insurance requirement at the trial level, the issue was not addressed by the Supreme Court. Id. at 343, 650 A.2d 757. Nor was it addressed in the Chancery Judge's opinion or our own opinion in that case. See New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 266 N.J.Super. 195, 628 A.2d 1094 (Ch.Div.1991), aff'd o.b., 266 N.J.Super. 159, 628 A.2d 1075 (App.Div.1993). The Supreme Court did comment regarding potential cost or harm to the shopping centers:
We do not believe our opinion will result in any harm to these centers, to their businesses, nor any less enjoyment for those who visit, shoppers and non-shoppers. The free speech we have permittedleafletting only, no speeches, no *26 parades, no demonstrationsis the least intrusive form of free speech and the easiest to control. The experience elsewhere proves the ability of those centers to absorb such speech without harm. The rare instances of disturbance resulted from circumstances most unlikely to occur here. Obviously, we cannot guarantee that disturbances will not occur as a result of our decision. Indeed, we could not guarantee freedom from such disturbances even in the absence of a right to leaflet. However, the slim possibility of disruption is the price we all pay as citizens of this state; the danger that some will abuse their rights is a necessary result of our constitutional commitment to free speech.
[Coalition, supra, 138 N.J. at 377, 650 A.2d 757 (footnote omitted).]
Here, the Chancery Judge considered the Coalition Court's statements regarding the importance of giving voice to small,[11] poorly financed groups, and found that the $665 insurance cost, when compared to the Green Party's then bank balance of $180, was cost prohibitive at the time when the Green Party sought access to the Mall in March 1997. At the time of the summary proceeding, when no request to use the Mall was pending, the Green Party had a cash balance over $2,600, and, therefore, the judge concluded that plaintiffs "could afford" the required insurance, "and possibly similar insurance at a few additional malls," although the record is silent about the premium cost for similar insurance coverage for additional malls.
The judge then stated: "The onerous cost of such insurance prevents most politically and socially active groups from exercising free speech rights." There is no factual basis or qualified evidence in the record for what is really a net opinion. Although insurance costs may have that effect for some small, poorly-financed groups, it may not hold true for others or for well-financed groups of whatever size. Of course, there are other locations and mediums where the right to freedom of speech may be exercised other than on private property of third parties. See Coalition, supra, 138 N.J. at 390, 650 A.2d 757 (Justice Garibaldi, dissenting).
The Coalition Court took note of an affidavit of a manager of the Sunvalley Mall in California that out of 266 permits issued in 1990, only one that year resulted in disruption, where a group of seventy activists handed out condoms in the mall.[12] The Court said that the Coalition defendants "could clearly prohibit such conduct by virtue of their power to regulate leafletting activities." Coalition, supra, 138 N.J. at 343 n. 7, 650 A.2d 757. Applying the test derived from Coalition's majority opinion, we cannot conclude as a matter of law that in this case or other cases that an insurance requirement is necessarily unreasonable as a means for assuring a private property owner that an asserted freedom of speech activity does not interfere with the Mall's business. It does appear that as of the summary proceedings Hartz had only been notified once about concerns stemming from a nonprofit group's use of the Mall facilities, when balloons were used by a group. While the record is unclear what the problem was, Hartz could certainly preclude groups from using balloons without raising constitutional concerns. Beyond that, Hartz was unaware (based on its then relatively limited experience with such activities) of any claims for damages, any personal injury or property *27 damage, or direct Mall security or law enforcement involvement resulting from approved non-profit informational activities at the Mall. Nonetheless, that does not establish that Hartz lacked a good faith reasonable basis for imposing the insurance requirement.
Hartz asserts that the insurance requirement is an appropriate regulation because it is uniformly applied, thereby avoiding any constitutionally impermissible subjectivity, pointing to Forsyth County, Georgia v. Nationalist Movement, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). In that case, a county ordinance imposed a fee for a parade permit, subject to a $1000 cap. The county administrator was to "`adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order,'" and fix the amount on a case by case basis. Id. at 131, n. 9, 112 S.Ct. at 2402, n. 9, 120 L.Ed.2d at 112, n. 9. The record indicated that fees of $5 to $25 had been charged to some groups, and waived for others, but that the defendant had been charged a $100 fee to conduct a rally with speeches on the courthouse steps for one-and-a-half to two hours. Id. at 127-132, 112 S.Ct. at 2399-2402, 120 L.Ed.2d at 109-113. The ordinance was found deficient because the fee decision was "left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors.... The First Amendment prohibits the vesting of such unbridled discretion in a government official." Id. at 133, 112 S.Ct. at 2403, 120 L.Ed.2d at 113. The Court found that the fee was imposed "to provide security for parade participants from angry crowds opposing their message." Id. at 135, n. 12, 112 S.Ct. at 2404, n. 12, 120 L.Ed.2d at 114, n. 12. Noting particularly the variable costs of policing cited by the County related to the public's reaction, the Court added: "Listeners' reaction to speech is not a content-neutral basis for regulation. Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." Id. at 134, 112 S.Ct. at 2403-2404, 120 L.Ed.2d at 114 (citations omitted). The ordinance could not be saved by reducing the $1000 cap to a smaller amount. The ordinance allowing imposition of a fee determined by a public official to use public property was "invalid because it unconstitutionally ties the amount of the fee to the content of the speech and lacks adequate procedural safeguards; no limit on such a fee can remedy these constitutional violations." Id. at 136-137, 112 S.Ct. at 2405, 120 L.Ed.2d at 115.
Hartz further asserts that even applying the "least restrictive means test," the UNITE court affirmed the imposition of an insurance requirement. The regulation under review in that case provided: "If the nature or timing of the activity creates a foreseeable risk of injury or damage to persons or property, and that risk, in the discretion of management, warrants special insurance protection, Applicant must purchase and carry the necessary insurance coverage as determined by [the] Center management." UNITE, supra, 65 Cal. Rptr.2d at 845. The application form asked for the name of the insurance company but, stated: "Failure to be covered by such insurance will not be cause for denial of this permit application, unless foreseeable risk warrants the need for special insurance." Ibid. (parenthetical reference omitted). The insurance requirement was not always enforced, and at least one mall's management indicated that insurance would not be required for the UNITE plaintiff's proposed activity. Id. at 845-846.
The UNITE court referred to the decision in H-CHH, supra, 193 Cal.App.3d 1193, 238 Cal.Rptr. 841, where the court found a similarly-worded rule defective because it constituted only a general and subjective standard. UNITE, supra, 65 Cal.Rptr.2d at 851. The H-CHH court *28 had held that such a provision could pass constitutional muster if the center crafted "necessary objective criteria," such as:
(1) Whether there is a prior history of injury to persons or property when this group engages in expressive activity; (2) whether there is a prior history of injury to persons or property when similar groups engage in expressive activity; (3) the historical scope of the risk and whether it exceeds the minimal or inconsequential; (4) whether the risk can be lessened or eliminated by adjusting the time, date, place or planned manner of expression; and (5) if so, whether the applicant is willing to make such adjustments.
[H-CHH, supra, 238 Cal.Rptr. at 857-858.]
After quoting this language, the UNITE court concluded that "[b]y stating this criteria, the H-CHH court implicitly held that in the proper circumstances, a center can require an applicant to carry insurance. What is needed is objective criteria by which such a decision is made." UNITE, supra, 65 Cal.Rptr.2d at 851 (emphasis in original). The UNITE court rejected arguments that the intervening decision in Forsyth, supra, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101, detracted from the H-CHH court's holding that a center can impose an insurance requirement if its decision is based upon objective criteria. UNITE, supra, 65 Cal.Rptr.2d at 852-853. The court concluded that the center's "attempt to learn the information needed to make an objective decision about requiring insurance by asking the applicant to identify in advance the individuals who will participate in the action," and by asking them to identify "the other locations where the participants engaged in similar activity in the prior year and any injuries to person or property which occurred during that activity, [was] the very `objective criteria' the H-CHH court said should be used in determining whether to require insurance." Id. at 853. The court, therefore, concluded that insurance could be required where there was a factual basis for doing so, and that the centers would carry the "initial burden of justification" for requiring insurance. Id. at 854.
As of plaintiffs' March 1997 application to use the Mall plaintiffs may have been precluded from using the Mall to distribute leaflets had there not been court-ordered relief, unless they obtained funds to purchase insurance or produced a reasonable alternative. By the time of the summary proceedings, there was more money available to the Green Party, and sufficient dollars on hand to cover the cost of the insurance.
Hartz relies on Jacobsen v. Harris, 869 F.2d 1172 (8th Cir.1989), which upheld a city's regulations requiring a permit, a permit fee, and evidence of liability insurance covering personal injury and property damage arising from the placement of newspaper vending machines (news racks) on public streets, to support its insurance requirement. Id. at 1173-1174. As to that insurance requirement, the Jacobsen court held that the city "has a legitimate interest in protecting itself from liability for injuries associated with the use of its property." Id. at 1174. In addition, the court held that the city "need not provide Jacobsen with the least expensive method of exercising his first amendment freedoms." Ibid. (citing Gannett Satellite Information Network, Inc. v. Metropolitan Transp. Auth., 745 F.2d 767, 774 (2d Cir. 1984) (another case allowing fees for news racks)). The court noted further that while there was no evidence of claims against the city regarding news racks, claims frequently arose from other objects placed in the public right-of-way. Under these circumstances, the court held that the insurance requirement was not invalid. Ibid. That case, however, dealt with a commercial publication, as distinguished from the small, nonprofit group and individuals that were the subject of Coalition, supra, 138 N.J. at 367-368, 650 A.2d 757.
Plaintiffs rely on other freedom of speech cases in which insurance requirements *29 were struck down. In Eastern Connecticut Action Group v. Powers, 723 F.2d 1050 (2d Cir. 1983), the plaintiff nonprofit organization (ECCAG) sought to hold a "Railathon" march along a thirteen-mile stretch of an abandoned railway bed to advocate revival of rail transportation. Id. at 1052. The Connecticut Department of Transportation (DOT) imposed a $100 administrative fee and an insurance requirement with coverage up to $750,000, and required ECCAG to execute a hold harmless agreement. Ibid. At the time ECCAG's budget was $12,000, which was devoted to rent, salaries and office expenses. ECCAG carried no insurance but was able to obtain insurance for the Railathon through a $150 rider upon a related organization's policy; this premium was paid with monies that ECCAG had intended to use for other purposes. Id. at 1052-1053. ECCAG therefore met the DOT's requirements, and held a successful Railathon in 1980 with no reports of injury or property damage. Id. at 1053. ECCAG sought to repeat the event in 1982, but the fee had been increased to $200, and the group could no longer afford insurance, which then would cost it $780. At that time, ECCAG's annual budget had dropped to $9500, and it carried a $4600 deficit. Ibid. The trial court's decision sustained the DOT's requirements.
The Second Circuit cited Hague v. Committee for Industrial Organization, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423, 1436 (1939) (plurality opinion), for the principle that public streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Eastern Connecticut, supra, 723 F.2d at 1053. The court added that such use of the streets and public places "for communication of views on national questions may be regulated in the interest of all ... [; but] it must not, in the guise of regulation, be abridged or denied." Ibid. (citing Hague, supra, at 515-516, 59 S.Ct. at 964, 83 L.Ed. at 1437). Finding that these principles and subsequent cases guided the court's understanding that the abandoned railway area is a public forum, the court evaluated DOT's requirements for use of the public area. The court first struck down the administrative fee, finding no evidence that the fee charged was equal to the administrative costs involved in processing the group's request. Id. at 1053. The court also struck down the insurance requirement as not representing the least restrictive means of serving the DOT's interest in avoiding losses to the State of Connecticut resulting from the plaintiff's activities. The court found that the group took significant efforts to avoid injuries, and it also required participants to sign waivers of any claims against the State. Id. at 1056-1057. Under these circumstances, the court held that the State "may not insist upon broader restrictions which substantially infringe constitutional rights, particularly in light of the uneventful history of the previous Railathon." Id. at 1057.
Eastern Connecticut further noted that even if the insurance requirement had been valid, there was no basis for the amount of coverage required. The court stated that a requirement for a policy with $100,000/$300,000 in liability coverage and $50,000 in property damage coverage was struck down as an unreasonable restraint on First Amendment rights in Collin v. O'Malley, 452 F.Supp. 577 (N.D.Ill. 1978), and in Collin v. Smith, 447 F.Supp. 676, 684-686 (N.D.Ill.), aff'd, 578 F.2d 1197, 1207-1209 (7th Cir.), cert. denied, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978) (on appeal the defendant conceded the unconstitutionality under federal law of an insurance requirement in its ordinance regulating demonstrations on public property).
In Rock Against Racism v. Ward, 658 F.Supp. 1346 (S.D.N.Y.1987), aff'd in part and rev'd on other grounds, 848 F.2d 367 (2d Cir.1988), rev'd on other grounds, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the court held that the city's insurance requirement for use of a band shell in *30 New York's Central Park was unconstitutional under federal law because it both gave the park administrators unfettered discretion as to when insurance would be required on public property, and did not represent the least restrictive means for accomplishing the city's interest in minimizing its exposure to liability. Id., 658 F.Supp. at 1356-1357. In that case, the plaintiff had a seven-year track record of sponsoring such events without injuries or claims, and the insurance regulation, when imposed, required a policy with limits of $1,000,000 per covered incident and $3,000,000 total. Id. at 1357.
Here, plaintiff argues that if $1,000,000 is an excessive coverage requirement for a rock concert on public property in Central Park, it is hard to justify that amount for a small group of leafleteers in a shopping mall. We find Eastern Connecticut, supra, and Rock Against Racism, supra, distinguishable in several important respects, mainly, both of those cases involved government action and the federal constitution whereas this case deals with limited freedom of speech rights on private property created by the Coalition Court, which went to great lengths to recognize the rights under our state constitution. Even considering plaintiffs' interests in constitutionally-protected freedom of speech on private property of the Mall, which has by judicial fiat been equated in New Jersey with the village square, the Chancery Judge's determination that an insurance requirement was unconstitutional misconstrues Coalition.
We see no reason why a private owner of a regional mall cannot impose reasonable insurance or hold harmless requirements in most, if not all, applications to use the mall for leafletting purposes. The mere fact that incidents have not occurred, does not guaranty that some incident will not occur, and it is not reasonable that an owner of private property cannot seek to protect against possible claims, whether real or frivolous. Moreover, a property owner does not have to await a tragic event, whether or not catastrophic before taking protective action. Indeed, a principal purpose of insurance is to protect against risk of loss. A prudent person, and certainly a prudent business entity is entitled to anticipate and protect against liability claims. We conclude that the Coalition decision contemplated such insurance when it noted that freedom of speech at regional malls "can be, and we have no doubt will be, carefully controlled by the centers." 138 N.J. at 334, 650 A.2d 757. Furthermore, the Coalition decision noted that "extremely broad" power to impose regulations concerning time, place and manner regulations are reposed in the owners of these private malls. Id. at 377-378, 650 A.2d 757.
We are loathe to attempt to legislate precise standards or criteria or terms of regulations. After all, this court is neither empowered to write legislation, nor propose regulations for private businesses. Dixon v. Gassert, 26 N.J. 1, 9, 138 A.2d 14 (1958); Matter of Sussex County Municipal Utilities Authority, 198 N.J.Super. 214, 218-219, 486 A.2d 932 (App.Div.), certif. denied, 101 N.J. 267, 501 A.2d 934 (1985). For the future, however, the following standards apply in considering the reasonableness of an insurance requirement as to a particular applicant, bearing in mind that, as noted in Coalition, these matters are all fact sensitive. 138 N.J. at 376, 650 A.2d 757. Affected malls, i.e., those subject to the Coalition case, must have the ability to impose regulations based on a standard, which we would describe as a good faith exercise of reasonable business judgment. In determining whether insurance should be required, and the precise amount, affected malls may take into account various factors such as (1) the identity of the applicant and the individuals who will participate in the activity at the mall; (2) other locations where the participants engage in similar activity in the current and previous years and any injuries to person or property that occurred; (3) the size of the group *31 and its assets; (4) the number of people who will be leafletting on behalf of the group at a mall at the same time or any one time; and (5) the insurance requirements imposed on other short time occupiers of space at the mall. We do not suggest that this list is an exhaustive list of factors that the Mall may consider in imposing an insurance requirement. Essentially, to withstand scrutiny under New Jersey's freedom of speech constitutional provision, as interpreted by Coalition, any regulation regarding insurance should set forth sufficient standards based on experience and need.
We do not say that regulations by private owners of the affected property in appropriate circumstances cannot require insurance in the amount of $1,000,000. However, the exercise of a good faith reasonable business judgment should take into account criteria for waivers where there are eligible groups that truly would not be able to afford the cost of insurance.
The Mall's steps to protect against potential liability may also take the form of hold harmless clauses or individual personal guarantees. It could also take the form of a relatively minimal application fee to cover a shopping center's cost to obtain a rider to its own coverage in the case of a group that is small and lacks sufficient assets. The Mall's regulations requiring an insurance policy should make a reasonable accommodation in those instances where circumstances would warrant either the waiver of an insurance requirement or some modification of that requirement. The case law we have reviewed, and as even conceded by plaintiffs, indicates that a requirement for insurance can be based on the experience of the group as well as in some cases the content of the message when of such a controversial nature as to engender potential conflicts.[13] There are many current issues where reference to news reports shows the volatility that can be quickly engendered. For example, abortion vs. right to life; Ku Klux Klan; Nazi Party; and conflicts between ethnic groups or religious groups. One need only consider the daily news reports to see how emotionally charged and indeed violent some of these issues have become. We think this is an unfortunate reflection on today's "enlightened" society, but it is part of the reality of today's life. What is needed is a common sense approach by regional shopping malls that come under the penumbra of the Coalition decision to formulate workable regulations, that may include insurance. Failure of such regional shopping centers to do so, will only invite the Legislature or the courts to step in to try to do so. In our view courts are ill-equipped to perform this function. See Dixon v. Gassert, supra, 26 N.J. at 9, 138 A.2d 14; Matter of Sussex County Municipal Utilities Authority, supra, 198 N.J.Super. at 218-219, 486 A.2d 932.

V.
Hartz contends that its hold harmless regulation is reasonable, because it accomplishes a legitimate shifting of contractual tort liability and related defense costs to plaintiffs and other similar applicants. Hartz asserts that without such provision "the Mall would be, in effect, subsidizing the private agendas of the groups seeking to proselytize on Mall property." Hartz further asserts that to abrogate its right to request a hold harmless agreement "forces the Mall to bear the burden of the public's free speech right."
The Chancery Judge addressed the insurance and hold harmless issues together, and did not engage in any analysis of hold harmless agreements. For apparently the same reasons as the insurance requirement, the judge held that the hold harmless agreement was a de facto ban on freedom of speech in shopping malls.
*32 For the proposition that hold harmless agreements are permitted under New Jersey law Hartz cites Carvalho v. Toll Brothers and Developers, 143 N.J. 565, 578, 675 A.2d 209 (1996). That case involved an engineer's liability for the death of an excavation company worker who was working on a sewer installation site. The township hired the engineer (Bergman) and a general contractor (Toll) for the sewer installation project. Id. at 569, 675 A.2d 209. After finding that Bergman owed a duty of care to the deceased worker because Bergman had the knowledge and presence on the site to have foreseen and avoided the harm, the Court addressed whether Bergman's hold harmless agreements with the township and Toll would be enforceable. Id. at 578, 675 A.2d 209.
The Supreme Court found that "the interpretation and enforcement of hold harmless agreements should be governed by the intention of the parties in providing for insurance and the division of risk." Ibid. The Court further observed that in New Jersey, "there is no essential public policy impediment to certain hold harmless agreements. The principle derives from recognition that, ordinarily, the responsibility for risk of injury is shifted by the primary parties to insurance carriers, and the parties should be left to determine how the insurance burdens shall be distributed." Id. at 578-579, 675 A.2d 209 (quoting Assembly Judiciary, Law, Public Safety and Defense Comm., Statement to Assembly Bill No. 590L.1983, c. 107, reprinted in N.J.S.A. 2A:40A-1 (paraphrasing Doloughty v. Blanchard Constr. Co., 139 N.J.Super. 110, 116, 352 A.2d 613 (Law Div.1976))). The Court concluded that it would be "unfair to exonerate Bergman from its liability to decedent on the basis of its exculpatory agreement with the township and Toll. Their financial arrangements and understanding do not overcome the public policy that imposes a duty of care and ascribes liability to the engineer in these circumstances." Id. at 579, 675 A.2d 209.
Hartz also relies on Stier v. Shop Rite of Manalapan, 201 N.J.Super. 142, 492 A.2d 1055 (App.Div.1985), where the court construed hold harmless agreements made by a landlord and tenant supermarket, each to indemnify the other in certain instances. The court found no legal basis for the supermarket to indemnify the landlord under those agreements for damages paid to a customer who had been mugged in the parking lot. Id. at 146-148, 156, 492 A.2d 1055.
The Stier decision arose in a purely commercial setting and there was no impediments honoring the parties' contractual decisions on how to assign risk. The Carvalho Court addressed a contractual situation involving public works, and there the engineer could not contractually escape liability for the very harm that its knowledge and presence on the site was presumably intended to avoid. Neither of these cases address whether a person should or must sign a hold harmless agreement in order to exercise constitutional rights.
A hold harmless agreement is related to an insurance requirement. For the reasons discussed above relating to insurance we conclude that a hold harmless agreement withstands scrutiny as an objectively reasonable means of deferring risk of loss.
Because the issue was first raised on a summary judgment motion, and not in the pleadings, the Chancery Judge considered the issue arguendo, and indicated that if the issue were properly before him that a "Black-Out period" and a one group restriction would be valid. We agree with the Chancery Judge in this respect. These restrictions were a reasonable means to enable the Mall to keep common areas open, available for movement and safe, particularly in high, seasonal shopping periods. We note, however, that the Mall's black-out period (which commences October 31), may preclude leafletting the weekend before the general election, and that fact should be taken into account in *33 formulating the black-out period or when considering waivers or exceptions.
The decision of the Chancery Division is reversed.
NOTES
[1] This numbered paragraph was subsequently revised. See infra at 209, 735 A.2d at 18.
[2] After the formation of the Green Party the plaintiffs successfully moved to amend the complaint to substitute the Green Party as a plaintiff in place of the Nader Committee.
[3] At oral argument the Green Party's attorney indicated that some malls charged a $6 application fee to defray costs of the mall obtaining a rider to its policy to cover one day's activities of non-profit leafletting by an organization. Plaintiffs indicated that an objection to such a charge would not be likely.
[4] Lofberg indicated Hartz's self-insured retention of $1,250,000 was a proper retention for it.
[5] Lofberg knew of some cases where malls required evidence of coverage for early morning jogging groups, but he thought that in most cases they did not, and the joggers and walkers were considered invitees. He did not know whether Hartz required coverage for a walking or jogging group.
[6] The Green Party obtained 1,721 unchallenged petition signatures and nominated a candidate for governor. The Green Party also obtained sufficient petition signatures to place two other candidates on the ballot, one in Essex County for Sheriff and another for Lawrenceville Town Council. The Essex County petition signatures were obtained at supermarkets in West Orange; in Lawrenceville petitions were obtained at the Acme Shopping Center.
[7] U.S. Const. amend. I states:

"Congress shall make no law ... abridging the freedom of speech...."
N.J. Const. art. I, ¶ 6 states:
Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.
[8] Robins v. Pruneyard Shopping Ctr., 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), aff'd, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (Pruneyard); H-CHH Assocs. v. Citizens for Representative Gov't, 193 Cal.App.3d 1193, 238 Cal.Rptr. 841, review denied (Oct. 29, 1987), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988) (H-CHH); and Savage v. Trammell Crow Co., 223 Cal.App.3d 1562, 273 Cal.Rptr. 302, review denied (Dec. 13, 1990), cert. denied, 500 U.S. 906, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991).
[9] At oral argument before us the Green Party took the position that even if it became affluent it should still not have to obtain insurance coverage, although it acknowledged that if it owned buildings it would presumably obtain coverage and the issue would be academic.
[10] Article I, § 2 of California's constitution, much like New Jersey's Constitution, guarantees every person the right to freely speak sentiments. See supra footnote 7.
[11] Logically, there seems little reason to qualify the reasoning based on the size of the organization. However, larger groups would perhaps have greater ability to raise funds, as well as have the potential for more liability claims. The Chancery Judge here held that the insurance requirement was a de facto ban on freedom of speech at the Mall because compliance, if achievable, was cost prohibitive, albeit that was the choice of plaintiffs who intentionally limited fund-raising and elected not to seek increased contributions.
[12] Incident and loss statistics can be interpreted many ways. See Darrell Huff, How to Lie With Statistics (W.W. Norton & Company 1954).
[13] At oral argument, plaintiffs acknowledged that the Mall could take into account the content of the message when regulating leafletting.